# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3318

_____

Allen L. Nicklasson,

          Appellant,

    v.

Don Roper, Warden,
Potosi Correctional Center,

          Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  Western District of Missouri.
\*
\*
\*
\*

_____

Submitted: January 10, 2007
Filed: June 21, 2007

_____

Before WOLLMAN, BEAM, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Allen Nicklasson was found guilty by a jury in a Missouri state court of first-degree murder and was sentenced to death. He appeals from the district court's[1] judgment denying his petition for a writ of habeas corpus. We affirm.

---

[1]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

For a complete recitation of the facts giving rise to this case, see State v. Nicklasson, 967 S.W.2d 596 (Mo. 1998). The facts relevant to this appeal are as follows. On August 23, 1994, Allen Nicklasson, Dennis Skillicorn, and Tim DeGaffenreid decided to return to Kansas City after a trip east to obtain drugs. Their vehicle broke down a number of times along I-70. After one such breakdown, they burglarized a home and stole four guns, ammunition, a skinning knife, money, a pillow case, some change, and a cracker box. They stashed the stolen property in the bushes, called a tow truck, and used the change-filled cracker box to pay a mechanic to restart the car. Once the car was restarted, they returned to recover the stolen property, at which point the car broke down once again.

Richard Drummond saw the three stranded men and offered to take them to a telephone. Accepting the offer, they transferred the stolen property from their car to the trunk of Drummond's vehicle, keeping a .22 caliber handgun and a shotgun with them when they entered Drummond's vehicle. Nicklasson then sat behind Drummond, pressed the pistol against the back of Drummond's head, and said, "[y]ou're going to take us to where we want to go." As they proceeded towards Kansas City, the three decided to kill Drummond and they had him drive to a secluded area off a county road. After ordering Drummond to stop and exit the car, Nicklasson walked him into the woods, ordered him to kneel, told him to say his prayers, and shot him in the head twice. Drummond's body was found eight days later. Nicklasson and Skillicorn were later arrested while hitchhiking in California.[2]

Following the imposition of his sentence, Nicklasson appealed his conviction to the Supreme Court of Missouri, arguing, *inter alia*, that the trial court had erred by (1) conducting a confusing and inadequate death qualification voir dire without defense participation, (2) prohibiting the defense from conducting follow-up voir dire

---

[2]For an account of Skillicorn's prosecution for this crime, see Skillicorn v. Luebbers, 475 F.3d 965 (8th Cir. 2007).

after asking the jury about their ability to follow Missouri's diminished capacity instruction, (3) barring any voir dire of jurors concerning their potential reaction to the introduction of evidence of Nicklasson's involvement in two other Good Samaritan murders, and (4) finding that the prosecution did not commit a racially-motivated Batson violation for striking two black jurors. A divided court held that the voir dire was constitutionally sufficient and found no error in the trial court's determination that the jury strikes were for legitimate reasons. Nicklasson, 967 S.W.2d at 609-14. Nicklasson's motion for post-conviction relief was also denied. Nicklasson v. State, 105 S.W.3d 482 (Mo. 2003). He then petitioned for a writ of habeas corpus in federal district court. Following the district court's denial of the petition, we granted a certificate of appealability on the above-mentioned issues.

## II. The AEDPA Standard

Pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA), we may not grant a writ of habeas corpus with respect to any issue decided by the Missouri state courts unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). AEDPA limits the scope of federal review "in order to effect the intent of Congress to expedite habeas proceedings with appropriate deference to state court determinations." Whitmore v. Kemna, 213 F.3d 431, 433 (8th Cir. 2000) (citing Williams v. Taylor, 529 U.S. 362, 402-03 (2000)). AEDPA "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." Williams, 529 U.S. at 412.

A state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to one reached by the Supreme Court on a question of

-3-

law or decides the case differently than the Supreme Court has decided a case with a materially indistinguishable set of facts. Id. at 405. A state court decision involves an "unreasonable application" of clearly established federal law if, in the federal court's independent judgment "the relevant state-court decision [not only] applied clearly established federal law erroneously or incorrectly[, but also did so] . . . unreasonabl[y]." Id. at 410-11. AEDPA requires federal courts to presume that state court factual findings are correct, and it places the burden on Nicklasson to rebut that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III. Death Qualification Voir Dire

### 1. Trial Court's Procedure

At the beginning of voir dire, the trial court made introductory remarks. It recounted, *inter alia*, a jury instruction concerning the elements of first-degree murder; it described the general decision-making process necessary to determine whether, if guilty, Nicklasson would receive a death or life imprisonment sentence; it discussed the role of mitigating and aggravating circumstances in the process; and it concluded by explaining the state's burden of proof.

Following this introduction, the trial court asked potential jurors whether they could both follow the court's instructions and (1) decide if the defendant was guilty or not guilty of murder in the first degree or of a lesser degree of homicide, (2) consider evidence of aggravating circumstances, (3) consider evidence of mitigating circumstances, (4) decide if the mitigating circumstances outweigh the aggravating circumstances, (5) unanimously decide with the other jurors that the aggravating circumstances outweigh the mitigating circumstances, (6) consider the imposition of the death penalty, and (7) consider the imposition of life without probation or parole.

With respect to death qualification, the court asked three additional questions of the venire panel: (1) whether they would automatically vote for the death penalty, (2) whether they would automatically vote for life without probation or parole, and (3) whether they would be able to follow the court's instructions and consider both the imposition of the death penalty or the imposition of life without probation or parole.

Sixteen venirepersons responded that they would both automatically impose the death penalty and would automatically impose life imprisonment if they convicted the defendant of first-degree murder. Despite this contradiction, the court refused to ask additional death qualification questions or allow counsel to do so.

## 2. Analysis

### A. The Sufficiency of the Death Penalty Voir Dire

Nicklasson's case is not materially indistinguishable from any decided by the Supreme Court. Nicklasson therefore argues that the issues presented represent an unreasonable application of clearly established federal law set forth in Morgan v. Illinois, 504 U.S. 719 (1992), Rosales-Lopez v. United States, 451 U.S. 182 (1981) (plurality opinion), and Wainwright v. Witt, 469 U.S. 412 (1985). Nicklasson, 967 S.W.2d at 610.

### i. The Clearly Established Federal Law

The Supreme Court has indicated that the Constitution demands that the defendant be afforded an impartial jury. Morgan, 504 U.S. at 729-30. "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." Morgan, 504 U.S. at 729 (citing Dennis v. United States, 339 U.S. 162, 171-72 (1950)). Without an adequate voir dire, a trial judge's responsibility to "remove prospective jurors who will not be able impartially to follow the court's

instructions and evaluate the evidence cannot be fulfilled . . . [and] the defendant's right to exercise peremptory challenges where provided by statute or rule [is impaired] . . . ." Rosales-Lopez, 451 U.S. at 188 (citations omitted).

The conduct of voir dire is generally left to the trial court's sound discretion, Morgan, 504 U.S. at 729. Indeed, "the trial judge retains discretion as to the form and number of questions on the subject. . . ." Turner v. Murray, 476 U.S. 28, 37 (1986) (plurality opinion) (citing Ham v. South Carolina, 409 U.S. 524, 527 (1973)). Whether a trial court is constitutionally compelled to ask certain questions or has unduly restricted questioning by counsel is dictated by the essential demands of fairness. Morgan, 504 U.S. at 730 (citing Aldridge v. United States, 283 U.S. 308, 310 (1931)). Indeed, "[t]o be constitutionally compelled . . . it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." Id. at 730 n.5 (second alteration in original) (quoting Mu'Min v. Virginia, 500 U.S. 415, 425-26 (1991)).

For this reason, "we have not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections."[3] Morgan, 504 U.S. at 730. To otherwise allow a death qualification voir dire in the absence of such inquiries leads to doubt as to whether the "petitioner was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment . . . ." Morgan, 504 U.S. at 739 (citing Turner, 476 U.S. at 36-37). The Supreme Court has, therefore, mandated questions that probe into whether potential jurors maintain views that "'prevent or substantially impair the performance of [their] duties as . . . juror[s] in accordance with [their] instructions and . . . oath.'" Witt, 469 U.S. at 433 (quoting Adams v. Texas, 448 U.S. 38, 45 (1985)). In particular, the state must be allowed inquiries probing the extent to which potential jurors' opposition to the death penalty

---

[3]The party wishing to exclude a juror must "demonstrate, through questioning, that the potential juror lacks impartiality." Witt, 469 U.S. at 423.

impacts their impartiality. Lockhart v. McCree, 476 U.S. 162, 170 n.7 (1986); see also Witt, 469 U.S. at 424 n.5. Conversely, the defendant must be allowed inquiries into whether potential jurors so strongly favor the death penalty that it affects their ability to follow the dictates of the law. Morgan, 504 U.S. at 735 (citing Turner, 476 U.S. at 34-35); see also Witherspoon v. Illinois, 391 U.S. 510, 521 (1968) (requiring questions meant to assure the defendant that the jury is not "organized to return a verdict of death").

### ii. The Reasonableness of Missouri's Application of Clearly Established Federal Law

The Missouri Supreme Court acknowledged that the Supreme Court mandated the Witherspoon and Witt death qualification voir dire questions and noted that such questions had been asked. Nicklasson, 967 S.W.2d at 611. It further recognized that

> [t]he test of the adequacy of voir dire is whether the process permits the parties to discover bias, prejudice or some other form of impartiality on the part of potential jurors. The trial court abuses its discretion and reversal is required only if the voir dire permitted does not allow the discovery of bias, prejudice or impartiality in potential jurors.

Id. at 609. We take no issue with this enunciation of the federal principle. In applying the principle, however, the Missouri Supreme Court effectively concluded that because Nicklasson's voir dire included questions that were mandated by the Supreme Court and deemed relevant to the discovery of impermissible juror bias, the trial court's questioning was constitutionally sufficient per se. Id. at 611.

By failing to recognize the need for additional death qualification voir dire questioning in the face of contradictory responses by sixteen potential jurors, the Missouri Supreme Court may have overlooked essential demands of fairness, thereby misapplying clearly established federal law. Were we reviewing this case on direct

appeal, we might have come to a different conclusion.[4]   As previously stated, however, "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable." Penry v. Johnson, 532 U.S. 782, 793 (2001).

We are unable to say that the Missouri Supreme Court's application of clearly established federal law, even if erroneous, is objectively unreasonable for the following reasons:

First, the Supreme Court observed in Yarborough v. Alvarado, 541 U.S. 652 (2004), that the more general the rule of decision, the more leeway courts have under the "unreasonable application" prong of § 2254(d)(1) to reach outcomes in case-by-case determinations. Id. at 664. Because determinations of whether specific voir dire questions are mandated hinge on the "essential demands of fairness," Morgan, 504 U.S. at 730, itself an indeterminate rule of decision, we extend to the Missouri courts a wide range of latitude in determining where to draw the relevant lines associated with that principle.

---

[4]We have noted that a trial judge's discretion in conducting voir dire is "not without limits." Harold v. Corwin, 846 F.2d 1148, 1150 (8th Cir. 1988). Further, we observed that

> [t]he court, in the realization that the purpose of the *voir dire* is to afford the parties a trial by a qualified, unbiased, and impartial jury, should at all times be on guard in its questioning in order to assist counsel in the exercise of his or her preemptory [sic] challenges and challenges for cause to eliminate those persons with an interest or bias.

Id. at 1150; see also United States v. Spaar, 748 F.2d 1249, 1253 (8th Cir. 1984) ("the central inquiry is whether the judge's overall examination, coupled with his charge to the jury, adequately protects the defendant from prejudice").

Second, the Missouri Supreme Court repeatedly justified its position by citing deference to the trial court's judgment because the trial court observed the jurors directly. See Nicklasson, 967 S.W.2d at 612. This is not an unreasonable position in light of Supreme Court precedent regarding the detection of juror bias. See Uttecht v. Brown, 2007 WL 1582998, at *6 (June 4, 2007). Reflective of the need for, and appropriate extent of deference, the Supreme Court has notably held that "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of [a party].'" Brown, 2007 WL 1582998, at *4 (last alteration added) (quoting Witt, 469 U.S. at 434).[5] This is because the deeply rooted nature of juror bias often precludes discovering it through general fairness and "follow the law" type questions. Morgan, 504 U.S. at 734-36; Witt, 469 U.S. at 424 ("determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism"). The Supreme Court has acknowledged that voir dire transcripts reviewed on appeal may not reveal subtle indications of bias otherwise detectable, even on a subconscious level, by the trial judge:

> [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law . . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

---

[5]Particularly relevant to our analysis is the Supreme Court's reminder that, when reviewing habeas petitions raising claims of Witherspoon-Witt error, we "owe deference to the trial court, which is in a superior position to determine the demeanor and qualifications of a potential juror." Uttecht v. Brown, 2007 WL 1582998, at *14 (June 4, 2007).

Witt, 469 U.S. at 424-26; see also Ristaino v. Ross, 424 U.S. 589, 594-95 (1976); Brown, 2007 WL 1582998, at *6 (June 4, 2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."). Accordingly, the Missouri Supreme Court acted reasonably and consistently with respect to Supreme Court doctrine by deferring to the judgment of the trial court judge that no further death qualification questioning was necessary.[6]

Third, the Missouri Supreme Court's extension of deference conformed to a principled and reasonable analytical framework. Though its decision accords a broad degree of deference to the trial judge's judgment, the court accorded that deference only after satisfying itself that the mandatory Witherspoon and Witt questions had been asked.[7] In fact, Nicklasson does not dispute that the judge asked questions specifically aimed at exposing death penalty bias. By recognizing the need that these questions be asked, the Missouri Supreme Court guaranteed that at least some

---

[6]We note that despite the arguably erroneous statements made in introductory remarks preceding the death qualification questions, nothing about the death qualification questions themselves appears confusing or unusual. Accordingly, the trial judge's observations may well have led him to interpret the conflicting responses to be, in context, indicative of moral uncertainty and not of confusion.

[7]Nicklasson contends that the questions suffered from infirmities because they consisted of "follow the law" questions and outmoded "automatic" penalty questions. Contrary to Nicklasson's contention, the trial court did not rely exclusively on "follow the law" questions. The questions relating to the automatic sentencing of life and death did not mention adherence to the law at all. Additionally, although the Supreme Court has dispensed with references to "automatic" decision making for purposes of articulating the standard against which potential jurors are to be considered for cause-based exclusion, Witt, 469 U.S. 424-26 (replacing the prior standard), it is not impermissible to phrase the question itself in "automatic"sentencing terms. See Morgan, 504 U.S. at 729 (noting that a juror who would automatically impose the death penalty would fail to qualify as impartial even under the new standard).

-10-

information could be elicited from every potential juror – through verbal and nonverbal responses – from which the trial judge could form impressions.[8] Furthermore, as indicated above, outside of constitutionally mandated question topics, "the trial judge retains discretion as to the form and number of questions on the subject . . . ." Turner, 476 U.S. at 37.

Fourth, the Missouri Supreme Court supported its position by noting that the Supreme Court has held that "removal for cause of 'Witherspoon -excludables' serves the State's entirely proper interest in obtaining a single jury that could impartially decide all of the issues in . . . [the] case." McCree, 476 U.S. at 180. Although the citation to McCree may have been taken out of context and read in an unintended way,[9] we cannot say that the Missouri Supreme Court's interpretation of the quotation was unreasonably strained. The quotation could indeed be read to support the contention that sufficient information may be gleaned from answers to a Witherspoon-type question to warrant excluding biased jurors. We have not been made aware of any Supreme Court case holding that a trial judge in a case such as this may not rely on proven questions but must ask follow-up questions.[10]

---

[8]For this reason, we find Nicklasson's citation of Turner v. Murray, 476 U.S. 28, 32 (1986), of limited relevance. In Turner, the Supreme Court reversed a ruling that a defendant was not entitled to have potential jurors questioned on issues of racial prejudice. Id. at 33. The issue before us here, however, is not whether Nicklasson was entitled to have jurors asked their views on the death penalty, but whether the questions asked on the subject were constitutionally sufficient in light of an arguable showing of juror confusion.

[9]The Supreme Court was addressing whether exclusions for death qualification reasons generate imbalanced juries, not voir dire adequacy. Lockhart v. McCree, 476 U.S. 162, 166-68 (1986).

[10]Nicklasson seems to suggest that because determinations of "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism," Witt, 469 U.S. at 424, the Supreme Court demands some amount of responsive exchange between the questioner and the venire panel. Contrary to this

-11-

Accordingly, even had the Missouri courts misapplied clearly established federal law pertaining to death penalty qualification voir dire, we are unable to grant habeas relief because Nicklasson has not shown that the misapplication was objectively unreasonable. The Missouri Supreme Court reasonably concluded that the questions asked were sufficiently specific to adequately probe the possibility of prejudice by the trial judge in whom much discretion is vested.

### B. The Jury Instructions Given to Venire Panels

Nicklasson asserts that the trial court, in its instructions preceding voir dire questioning, erred by omitting the "knowledge" element of first-degree murder, by offering a very general definition of "mitigating circumstances," by later asking jurors if they could follow the law after telling the jurors that the law they must follow would be described in full in final jury instructions, and by erroneously describing evidence in mitigation of punishment as evidence that would make "this homicide . . . not as serious as other homicides or that [would make] the character of the defendant . . . not as bad as others who have committed murder in the First Degree . . . ." We need not address these points, however, because the Missouri Supreme Court concluded that these claims were procedurally barred.[11]

---

contention, the quotation when read in its full context was meant to convey the Supreme Court's opinion that the stated responses to questioning, taken alone, will not always expose all impermissible bias. Id. at 424-26; Brown, 2007 WL 1582998, at *4.

[11] [These] claims are without merit.  First, the [trial court's comments] refute most of [Nicklasson's] assertions of error based on omission.  *Second, Nicklasson's brief fails to favor the Court with legal argument or authority tying his generalized assertions of error to specific prejudice. Absent such argument, there is nothing for the Court to review . . . .*  Finally, assuming *arguendo*, that the trial court misspoke in some way during its introductory

"[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (quotation omitted). Here, the Missouri Supreme Court clearly and expressly stated that these claims lacked merit because Nicklasson offered "nothing for the Court to review." Nicklasson, 967 S.W.2d at 608. That the Missouri Supreme Court also addressed the merits in the alternative is of no relevance. Harris, 489 U.S. at 264 n.10 (noting that a state court may address the merits in an alternative holding without fear of federal habeas review when the state court explicitly invokes a state procedural bar as a separate basis for decision). Accordingly, we review a federal habeas petitioner's constitutional claims that were defaulted in state court under the cause and prejudice standard. Murray v. Carrier, 477 U.S. 478, 485-86 (1986). As Nicklasson does not now present any argument relating to cause and prejudice, he is precluded from obtaining habeas relief on these grounds.

## C. Diminished Capacity Voir Dire

Nicklasson was allowed to recite Missouri's diminished capacity instruction and ask the venire panel whether they could follow it, but he was not allowed to ask whether any jurors had preconceived notions about mental health or psychology that amounted to a disqualifying bias against the acceptance of related testimony. Nicklasson contends that because a diminished capacity defense necessarily requires reliance on such testimony, this restriction violated his respective rights to due

---

      presentation to the venire, the jury received proper instructions during the guilt and penalty phases of the trial correcting the trial court's earlier error before deliberations began . . . . The points are denied.

Nicklasson, 967 S.W.2d at 608 (emphasis added).

-13-

process, a fair trial by an impartial jury, effective assistance of counsel, and freedom from cruel and unusual punishment.

Although clearly established federal law does in some instances require inquiries into certain biases such as race, Ham, 409 U.S. at 527, a bias against psychological testimony is not among them. Cf. Ross, 424 U.S. at 594-95 (observing that "the State's obligation to the defendant to impanel an impartial jury generally can be satisfied by less than an inquiry into a specific prejudice feared by the defendant"). Because the conduct of voir dire is generally left to the trial court's sound discretion, Morgan, 504 U.S. at 729, Nicklasson had no entitlement to the questions. Furthermore, we see no reason to conclude that the Missouri courts misapplied clearly established federal law and disregarded essential demands of fairness, because Nicklasson was allowed to (1) read to the venire the Missouri Approved Instruction on diminished capacity, (2) answer any questions potential jurors asked relating to the instruction, and (3) ask members of the venire if they could follow the instruction. This voir dire process produced no indication that any venireperson would be unable to adequately consider the diminished capacity defense. The Missouri Supreme Court's deference to the trial judge's conclusion that this process produced no indication that any venireperson would be unable to fully consider and follow the diminished capacity defense was reasonable and is entitled to deference. 28 U.S.C. § 2254(d).

D. Unadjudicated Crimes Voir Dire

Finally, Nicklasson contends that the Missouri courts violated clearly established federal law by barring defense counsel from questioning the jury as to whether information pertaining to additional homicides in Arizona would substantially impair their ability to follow the law in the penalty phase. Nicklasson reasons that in light of evidence supporting his involvement in additional murders, some jurors might

be incapable of fully considering all of the mitigating sentencing factors and might be so blinded by their biases that they could not consider life imprisonment.

This claim is lacking in merit because it mischaracterizes the trial court record. Nowhere in the record does Nicklasson's counsel request the questions Nicklasson now claims were disallowed; nor have we been able to identify an instance in which the trial judge had stated that he would not allow such questions even were they desired.[12] Instead, read in context, the cited portion of the transcript only describes defense counsel's request of leave to ask potential jurors whether, given the indirect evidence of additional murders likely to be presented in the guilt phase of the trial, they would be able to put aside that evidence when considering Nicklasson's guilt for Drummond's murder.[13] The trial judge disallowed questioning on that guilt-phase

---

[12]In the pre-trial transcript, there is a mention by Nicklasson's counsel of a previous off-the-record chambers discussion between himself and the judge concerning the judge's not wanting further questioning relating to punishment. This represents the only reference to any prohibition against questions in the penalty stage. A trial court's decision will not be found to be constitutionally erroneous in the absence of a record that clearly reflects that decision.

[13]The defense began by saying that

[t]here will be evidence in this case that two or more people were killed in Arizona . . . . This evidence wouldn't be admitted in its entirety until the second half of the trial if we get that far, but there will be indirect reference to these Arizona murders throughout the first part of the trial. I need to ask you a question about the effect of knowing that Mr. Nicklasson will be responsible for two other deaths in Arizona . . . . How many of you are concerned about your ability to put aside evidence of two additional murders when in this first part of the trial you are being asked only to return Allen's mental state at the time of the shooting?

Although not a model of clarity, the wording of the question itself and the discussion between defense counsel and the trial judge before and after the above-quoted

-15-

topic. The Missouri Supreme Court found no abuse of discretion. As the requested question was not crafted or intended to detect impermissible juror sentencing bias, we cannot grant habeas relief on this basis.

## IV. Alleged Batson Violations

Finally, Nicklasson argues that the prosecutor's peremptory challenges of Katy Yokley and Karen McNeil, both African-Americans, were racially motivated and violated Batson v. Kentucky, 476 U.S. 79, 89 (1986). The trial court found that the prosecutor was not improperly motivated. The Missouri Supreme Court affirmed.

Alleged Batson violations are considered in a three-step process. First, the opponent of a peremptory challenge must make a prima facie case of racial discrimination. Second, the proponent of the strike must tender a race-neutral explanation. Finally, the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam) (citing Hernandez v. New York, 500 U.S. 352, 358-59 (1991) (plurality opinion)). In federal habeas review, the factual findings of state courts – which include findings relating to the genuineness of the prosecutor's peremptory challenge motive – "are presumed to be correct, and may be set aside, absent procedural error, . . . only if they are not fairly supported by the record." Purkett, 514 U.S. at 769 (quotation marks and citation omitted); see also 28 U.S.C. § 2254(e).

Nicklasson has failed to meet his burden, and the record supports the trial court's finding of a race-neutral motivation. Nicklasson contends that the prosecutor's proffered reasons for striking two black panelists "applies just as well to . . . otherwise-similar nonblack[s] who [are] permitted to serve." Miller-El v. Dretke, 545 U.S. 231, 241 (2005). The state argues that there were relevant differences between

language leaves us with no doubt that the desired question pertained only to the guilt phase of the trial.

the white and black potential jurors. In response, Nicklasson points out that the differences are minor and that to impose a per se rule requiring identically situated prospective jurors as a prerequisite to a finding of a <u>Batson</u> violation would leave <u>Batson</u> inoperable. <u>Id.</u> at 247 n.6. Nevertheless, although <u>Miller-El</u> does bar such a per se rule, it also provides that the credibility of the reasons given by the prosecution may be measured by "'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" <u>Id.</u> at 247 (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 339 (2003)). This approach accounts for the nature and extent of the differences.

Yokley was purportedly excused because, in response to a death qualification voir dire question asking whether she would automatically impose a life sentence if the defendant was convicted of first-degree murder, she responded "probably." A Caucasian venireperson, Janice Floyd, responded to the same question with "I believe so" and was not excused. Although Floyd provided a similar response to the death qualification voir dire question, the particular responses were central to the prosecution's determination of whether, and to what extent, prospective jurors might be committed to imposing life imprisonment over the death penalty. We agree with the Missouri Supreme Court's observation that "[t]he state is entitled to make judgments about the strength of a particular venireperson's commitment to the life-without-parole option, vis-a-vis, that of another venireperson whose words do not convey the same conviction." <u>Nicklasson</u>, 967 S.W.2d at 613-14. It is an entirely reasonable trial strategy for a prosecutor to excuse a juror whose responses suggest that they may be more committed to the imposition of life in prison than others.

It is reasonable to contend that a potential juror answering "probably" would be more committed to a position than one answering "I believe so." "Probably" presents a predictive assessment cloaked in the objective garb of statistical language, whereas "I believe so" reflects a naked, subjective impression. Generally, objective or quantifiable evidence is more persuasive and comprehensible than subjective or qualitative evidence. The responses differ in their emphasis. This is a subtle

distinction perhaps, but it has a direct bearing on a legitimate, reasonable, non-race-based trial strategy. Furthermore, as previously discussed, the trial court judge restricted death-qualification voir dire and asked those questions himself. In light of these restrictions, even minor differences between each potential juror's response take on added significance; such differences are all the parties have to inform their peremptory challenge decisions.

Nicklasson's reliance on Miller-El does not bolster his argument because the Supreme Court's finding of a Batson violation did not hinge entirely on the closeness of the excluded black juror's testimony to that of the white, but on the "totality of the relevant facts" pertaining to the prosecutor's conduct during the defendant's trial.[14] Miller-El, 545 U.S. at 239. Nicklasson does not offer similarly compelling "totality of the record" evidence and instead relies entirely upon allegedly inconsistent treatment of jurors who gave similar responses.[15] Although the inconsistent application of a prosecutor's peremptory challenge rationale between similarly

---

[14]The Court noted that the prosecutor excluded 91% of eligible black venire panelists, mischaracterized a black venireperson's testimony in such a way as to make that testimony appear objectionable and different from that of a white venireperson when, in fact, the black venireperson's responses should have made the individual an ideal jurist for the prosecution, failed to ask follow-up voir dire questions to clarify claimed distinctions of import, and exhibited a pattern and practice of manipulating Texas voir dire panelist dismissal rules to effectuate the automatic dismissal of black venirepersons. Miller-El, 545 U.S. at 240-66.

[15]Unlike the situation in Miller-El, the parties here were not permitted to ask follow-up death qualification questions, thereby increasing the significance of even minor differences in responses. Additionally, the state's proffered rationale as applied to the potential juror's testimony in Miller-El was clearly a mischaracterization, Miller-El, 545 U.S. at 244, but not so here. The prosecution in Miller-El struck an otherwise ideal juror for the prosecution, id. at 247; here, the prosecution struck a juror whose statements, no matter how characterized, would be considered strategically unfavorable to a prosecutor seeking the death penalty. Finally, there is no evidence here of a pattern and practice of rule manipulation to avoid empaneling black jurors.

situated white and black jurors constitutes evidence of purposeful discrimination, see id. at 241, there is not, nor should there be, a per se rule stating that the presence of such evidence alone must always constitute "clear and convincing" evidence sufficient to satisfy Nicklasson's burden no matter its strength. Accordingly, Nicklasson has failed to demonstrate that the Missouri Supreme Court unreasonably applied clearly established federal law when it concluded that Yokley's exclusion was not motivated by race.

The prosecution also struck Karen McNeil, a child protection investigator for the Illinois Division of Family Services, who is black. The prosecution claimed it struck her to avoid her relating her work-related experiences in the jury room. Nicklasson argues that the proffered reason was pretextual because venireperson Stark, a white clinical nurse specialist in child psychology, was not struck and might similarly share stories of child abuse. The trial court was persuaded that there "are quantum differences between the two jobs" and did not believe the strike was racially motivated. The Missouri Supreme Court elaborated on these differences, noting that family services investigators deal with "physical and familial aspects of a child's life and attempts to stop or prevent abuse" while a clinical nurse specialist in child psychology "attempts rehabilitation of the mind and spirit after abuse has occurred." Nicklasson, 967 S.W.2d at 614. These findings are entitled to deference under §§ 2254(d) and (e), and we agree with the Missouri courts that the experiences associated with the two jobs are sufficiently different as to justify the prosecutor's use of a peremptory challenge on McNeil but not on Stark. See United States v. Pherigo, 327 F.3d 690, 696 (8th Cir. 2003) (noting that employment is a valid race-neutral reason for exercising a peremptory challenge); United States v. Johnson, 905 F.2d 222, 222 (8th Cir. 1990).

The judgment is affirmed.

_____