# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2010

_____

Rozanna Csiszer, Individually and as   *
Next Friend of Allison Csiszer, A   *
Minor; Charles Csiszer, Individually   *
and as Next Friend of Allison Csiszer,   *
A Minor,   *
  *
    Plaintiffs/Appellants,   *
  *   Appeal from the United States
  *   District Court for the
    v.   *   Western District of Arkansas.
  *
Mary R. Wren, MD; Wren & Barrow   *
Obstetrics & Gynecology, PLLC,   *
doing business as The Center for   *
Women,   *
  *
    Defendants/Appellees,   *
  *
Baxter County Regional Hospital, Inc.,   *
doing business as Baxter County   *
Medical Center,   *
  *
    Defendant,   *
  *
Continental Casualty Company,   *
  *
    Defendant/Appellee,   *
  *
Perry Wilbur, MD; Perry Wilbur, MD,   *
PA,   *
  *
    Defendants.   *

_____

Submitted: April 13, 2010
Filed:   August 6, 2010
_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Rozanna and Charles Csiszer sued the hospital and obstetrician that provided care to Rozanna during the birth of their daughter, Allison Csiszer. The complaint alleged that negligent care during the delivery was the proximate cause of Allison's cerebral palsy. The jury returned a verdict for the defendants. The Csiszers appeal, arguing that the district court[1] committed several errors in its conduct of the trial. We affirm.

I.

Throughout Rozanna Csiszer's pregnancy, she was treated by physicians, including Dr. Mary Wren, who were on staff at Wren & Barrow Obstetrics and Gynecology, PLLC (also called the Center for Women). On the morning of February 24, 2006, Rozanna was examined during a prenatal visit by Dr. Eric Shultz, who noted decreased fetal movement and decreased amniotic fluid. Shultz immediately admitted Rozanna to Baxter Regional Medical Center to induce labor. Rozanna remained in the care of Dr. Shultz until approximately 7 p.m., at which time Dr. Wren assumed Rozanna's care. Nurse Angie Padgett came on duty around this same time and also attended to Rozanna.

_____

[1]The Honorable Robert T. Dawson, United States District Judge for the Western District of Arkansas.

Dr. Shultz had begun the administration of Pitocin, a medication that stimulates uterine contractions, to Rozanna that morning. Dr. Wren continued the administration of Pitocin and increased the dosage several times between 7:00 p.m. and approximately 10:00 p.m. At approximately 12:30 a.m., Dr. Wren first broached the possibility of delivering the baby by Cesarean section. Although the Csiszers initially resisted the idea, when Dr. Wren again recommended a C-section at 1:22 a.m., because little progress had been made towards a vaginal delivery, the Csiszers agreed. Dr. Wren discontinued the administration of Pitocin, and Dr. Wren delivered Allison by C-section at 2:31 a.m. on February 25. Allison was later diagnosed with cerebral palsy.

The Csiszers filed suit in January 2008 against Dr. Wren, the Center for Women, and the Medical Center, alleging that their negligence and the negligence of Nurse Padgett (who was not named as a defendant) proximately caused Allison's condition. The Csiszers claimed that Wren and Padgett negligently administered the Pitocin, which resulted in the hyperstimulation of Rozanna's uterus, and deprived Allison's brain of oxygen during the second stage of labor. They further alleged that Dr. Wren should have ordered a Cesarean section and ceased administration of Pitocin sooner than she did. The Csiszers alleged that Baxter Regional Medical Center was vicariously liable for the acts of its employees and was independently liable for failing to provide adequate training and supervision to its medical personnel. The defendants responded that Allison's injury occurred before the labor and delivery, and that Wren and Padgett did not act negligently.

The case proceeded to trial before a jury. On the fifth day of trial, a juror was dismissed by the court after he waved to a woman whom he recognized in the gallery. On February 20, 2009, after nine days of trial, the jury unanimously found the defendants not liable for the damages claimed by the Csiszers. The Csiszers raise several alleged trial errors on appeal.

II.

A.

The Csiszers argue that the outcome of the trial was tainted by the influence of a provision of Arkansas law that was declared unconstitutional by the Supreme Court of Arkansas after the conclusion of this trial. The provision reads: "Any evidence of damages for the costs of any necessary medical care, treatment, or services received shall include only those costs actually paid by or on behalf of the plaintiff or which remain unpaid and for which the plaintiff or any third party shall be legally responsible." Ark. Code Ann. § 16-55-212(b).

The district court denied the Csiszers' motion in limine urging the court to declare § 16-55-212(b) unconstitutional under the Arkansas constitution. A few months later, in *Johnson v. Rockwell Automation, Inc.*, 308 S.W.3d 135, 138 (Ark. 2009), the Supreme Court of Arkansas made that declaration. The court held that § 16-55-212(b) was a rule of evidence, and that the state legislature encroached on the authority of the judicial branch, in violation of the State's constitutional separation of powers, when it enacted the section. *Id.* at 142.

Because the jury did not find any of the defendants liable for Allison's cerebral palsy, it did not reach the question of damages. The Csiszers maintain that the statutory limitation on evidence relating to damages nonetheless affected the jury's verdict, because of an assertion made by counsel for the Medical Center in final argument. Counsel stated:

> What you heard . . . was that *every single need she has has been met*. She has received every medical treatment she has needed, every therapy she has needed. And every piece of equipment she has needed has been provided to her. [Plaintiffs' counsel] introduced that all of that for the last three years cost about $29,000. And all of the truth – all of the

evidence you have heard is *she will continue to have every one of her needs met regardless of the outcome of this case* for the rest of her life. So the only thing that has been raised in that area that's not met is that they need a $100,000 to $150,000 a year to hire someone to be in the home with them. And I want you to think about all of that because it, it goes into the credibility of the whole case.

The Csiszers argue that § 16-55-212(b) "set up" this argument, which implied to the jury that the Csiszers were acting dishonestly by making a bad faith request for damages. This implication, the argument goes, unfairly influenced the jury against the Csiszers and rendered the trial manifestly unfair.

The Csiszers first raised this argument in a motion for new trial, which was denied by the district court. We normally review the denial of a motion for new trial under the abuse of discretion standard, *Vassar v. Solem*, 763 F.2d 975, 979 (8th Cir. 1985), but the Csiszers neither objected during the closing argument, nor moved for a mistrial. They sought no curative or remedial action before the case was submitted to the jury. Raising an objection for the first time in a post-verdict motion for new trial is not sufficient to preserve it. Because the Csiszers forfeited their objection, we review only for plain error. *See Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 835 (8th Cir. 2005).

"Plain error is a stringently limited standard of review, especially in the civil context." *Id.* (internal quotation omitted). To obtain relief, a party must show that a clear or obvious error affected its substantial rights at trial. If those points are established, then we have discretion to correct the error if the appellant also demonstrates that the error seriously affected the integrity, fairness, or public reputation of judicial proceedings. *Rahn v. Hawkins*, 464 F.3d 813, 819 (8th Cir. 2006). The Csiszers cannot make this showing.

In light of the Arkansas court's decision in *Johnson*, the district court did err by limiting the presentation of evidence relating to damages based on § 16-55-212(b). And because we must consider the law at the time of appeal when reviewing for plain error, *see Johnson v. United States*, 520 U.S. 461, 468 (1997), the error is clear. But this error did not affect the Csiszers' substantial rights. The jury heard a large volume of evidence over the course of this nine-day trial; the trial transcript is over 2000 pages long. We see no reasonable probability that the jury's verdict on liability that the defendants were not negligent would have been different but for statements made in closing argument that the Csiszers had not met their burden of proof on the amount of damages. To the contrary, the objectionable portions of the argument, as well as any evidence presented concerning the financial aspects of Allison's care and treatment, were rendered irrelevant by the jury's verdict in the defendants' favor on liability. The Csiszers have not met their burden to show a plain error warranting relief.

B.

The Csiszers also challenge the district court's denial of their motion in limine urging the court to declare invalid another provision of Arkansas law. Section 16-114-207 of the Arkansas Code, like § 16-55-212(b), was enacted as part of the Arkansas Medical Malpractice Act. It provides:

> In any action for medical injury[,] . . . [n]o medical care provider shall
> be required to give expert opinion testimony against himself or herself
> as to any of the matters set forth in § 16-114-206 at a trial. However,
> this shall not apply to discovery. Discovery information can be used at
> a trial as in other lawsuits.

Ark. Code Ann. § 16-114-207(3). Section 16-114-206, which is referenced in the challenged provision, sets forth the elements that a medical malpractice plaintiff must

-6-

prove through expert testimony.[2] The Csiszers characterize § 16-114-207(3) as a legislatively-created evidentiary privilege, and, citing *Johnson v. Rockwell Automation*, they argue that it violates the Arkansas separation-of-powers doctrine. They also make an equal protection claim, arguing that the provision violates their fundamental rights to a fair trial and to cross-examine witnesses.

We consider the equal protection claim first. The Csiszers argue that because the statute burdens fundamental rights, we should apply strict scrutiny in our analysis of § 16-114-207(3), and require that the statute must further a compelling state interest in a way that is least restrictive of the Csiszers' constitutional rights. *See Jegley v. Picado*, 80 S.W.3d 332, 350 (Ark. 2002). We disagree, because we do not think the Supreme Court of Arkansas would conclude that the statute burdens fundamental rights. In addressing an argument that § 16-114-207(3) violated the same rights that the Csiszers invoke here, the Arkansas court said that the provision "'does not unduly

---

[2]Section 16-114-206 states:

(a) In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:

(1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;

(2) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant that the medical care provider failed to act in accordance with that standard; and

(3) By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

restrict the rights of malpractice plaintiffs,'" because "'it does not prevent the plaintiff from requiring the defendant to testify regarding factual issues but only prevents him from requiring the defendant to give his expert opinion on matters such as the relevant standard of care and proximate cause.'" *Whorton v. Dixon*, 214 S.W.3d 225, 231 (Ark. 2005) (quoting *Carson v. Maurer*, 424 A.2d 825, 832-33 (N.H. 1980) (analyzing a similar statute)). Nor does the provision create a suspect classification that burdens a discrete and insular minority or some other group to which the Arkansas court is likely to afford special protections. *See Am. Bank & Trust Co. v. Cmty. Hosp.*, 683 P.2d 670, 677 & n.10 (Cal. 1984) (collecting cases rejecting the argument that legislation governing medical malpractice suits creates an unconstitutional classification). When a challenged statute does not infringe upon a fundamental right or create a suspect class, an equal protection claim is subject to rational basis review. *See Rose v. Ark. State Plant Bd.*, 213 S.W.3d 607, 617 (Ark. 2005).

The Supreme Court of Arkansas already has held that § 16-114-207(3) survives rational basis review. *Whorton*, 214 S.W.3d at 230-31. The provision – like the entire Medical Malpractice Act of which it is a part – is rationally related to achieving the Act's stated purpose of "help[ing] control the spiraling cost of health care" by aiming for a reduction in the high malpractice premiums caused by widespread malpractice litigation. *Id.* at 230 (internal quotation omitted); *see also Eady v. Lansford*, 92 S.W.3d 57, 61-62 (Ark. 2002) (holding that a rational relationship exists between the legitimate government objective of controlling health care costs and the burden of proof requirements of § 16-114-206). Therefore, the Csiszers' equal protection claim fails.

Whether the Supreme Court of Arkansas would conclude that § 16-114-207(3) violates the separation of powers is a more difficult question. The court declined to address this question in *Whorton*, 214 S.W.3d at 231, and we must predict how that court would rule on the issue. The Csiszers argue that the Supreme Court would

invalidate this provision on the same grounds on which it invalidated § 16-55-212(b) in *Johnson*.

In ruling the damages provision unconstitutional in *Johnson*, the Supreme Court of Arkansas described the provision as "clearly limit[ing] the evidence that may be introduced relating to the value of medical expenses." 308 S.W.3d at 142. Because it is the province of the courts to dictate rules governing admissibility of evidence, the court ruled that the legislature's promulgation of the provision violated the separation of powers. *Id.*

The scope of the decision in *Johnson* is uncertain, because the Arkansas court previously rejected a separation-of-powers challenge to a similar restriction in the Arkansas rape shield law. That statute precluded the introduction of any evidence relating to an alleged rape victim's sexual history. Nonetheless, the court in *Sera v. State*, 17 S.W.3d 61 (Ark. 2000), did "not view the statute as having supplanted [its] rulemaking power and ability to control the courts." *Id.* at 78.

The effect of § 16-114-207(3) is narrower than both the damages provision declared unconstitutional in *Johnson* and the rape shield statute at issue in *Sera*. Unlike the prohibitions on all evidence relating to the value of medical expenses not borne by a plaintiff, or all evidence relating to an alleged victim's sexual history, the restriction on expert testimony from a defendant does not bar evidence on an entire subject matter. Instead, it governs the manner in which a plaintiff can meet the burden of proof. A medical malpractice plaintiff must introduce expert testimony regarding the proper standard of care to satisfy his burden. Ark. Code Ann. § 16-114-206. Section 16-114-207(3) does not prevent the jury from hearing evidence relating to the standard of care or the defendant's satisfaction of that standard. It simply restricts the possible sources for that evidence, by prohibiting the plaintiff from forcing *the defendant* to provide the testimony necessary to satisfy the plaintiff's burden. *See Whorton*, 214 S.W.3d at 231. A malpractice plaintiff is free to present evidence on

the standard of care through other witnesses. Given the relatively narrow scope of §
16-114-207(3), as compared to the provisions considered in *Johnson* and *Sera*, we
think it is more likely that the Supreme Court of Arkansas would reject a separation-
of-powers challenge to the statute.

Even if the district court erred in applying § 16-114-207(3), moreover, we
conclude that any error was harmless. A malpractice defendant loses the protection
of § 16-114-207(3) if she gives opinion testimony during trial. *Whorton*, 214 S.W.3d
at 231. At the pretrial conference, the court and attorneys for both sides discussed this
aspect of the rule, and the record demonstrates a clear understanding that if Dr. Wren
testified on direct examination about the proper standard of care, then the Csiszers
could explore that subject with her during cross-examination. The defense indicated
its intention to ask standard-of-care questions of Dr. Wren, and acknowledged that the
Csiszers would then "have every opportunity to cross examine her on that." Counsel
for the Csiszers responded that he would "wait with bated breath" for the defense to
call Dr. Wren and inquire about the standard of care, and that if no such questions
were raised, then counsel agreed to approach the bench and reiterate an objection to
the application of § 16-114-207(3).

The defense did call Dr. Wren as a witness, and asked her the following
questions:

- "When you were providing care to Allison – Mrs. Csiszer and her
  unborn child, Allison, did you provide the care that you had been trained
  to provide at University of Oklahoma Medical Center in Oklahoma
  City?"

- "Did you provide the type of care that you had provided for your patients
  both at Oklahoma City, in your practice in Kansas City, and up until that
  point in Mountain Home, Arkansas?"

- "Did you provide the best care and treatment you knew to give Miss Csiszer and her child?"

Dr. Wren answered each question. At that point, the door was opened to further questioning about the standard of care, but counsel for the Csiszers declined to walk through it. The cross-examination included no questions about the standard of care, and no bench conference was requested. Because the Csiszers had an opportunity to cross-examine Dr. Wren on the standard of care, they cannot show that they were prejudiced by the application of § 16-114-207(3).

## III.

The Csiszers next challenge the district court's ruling to prohibit Nurse Janine Eagon, an expert witness called by the plaintiffs, from offering opinion testimony concerning institutional negligence on the part of Baxter Regional Medical Center. A district court possesses broad discretion in ruling on the admissibility of expert testimony, and we will reverse only if the court has abused that discretion. *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003).

The Csiszers sought to introduce testimony from Nurse Eagon to support their allegations of negligence against Baxter Regional Medical Center. Her testimony was designed to fulfill the requirement of expert testimony set forth in § 16-114-206 of the Arkansas Code. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), the Csiszers' pretrial disclosures included a written report prepared by Nurse Eagon. In this report, Nurse Eagon stated her view that the care provided to Rozanna by Nurse Padgett had been substandard. The report further stated:

> There was a failure to adhere to policy by intervening on behalf of the patient and initiating the Chain of Command as necessary. Unfortunately, the Labor and Delivery "Fetal Monitoring Policy" is void of clear and concise direction in regards to the use of appropriate

-11-

terminology, documentation, and nursing responsibility during fetal monitoring. . . . It is my opinion that the Standard of Care was not met, and that Baxter Regional Medical Center's Labor and Delivery Policy and Procedures, and Baxter Regional Medical Center's failure to provide a competent Labor and Delivery Nurse contributed to the unfortunate outcome of Allison Csiszer.

The defendants deposed Nurse Eagon several weeks after she completed her written report. During her deposition, Nurse Eagon retreated from her written criticisms of the hospital. Defense counsel asked her repeatedly if she had any criticisms of any of the hospital's policies or procedures, and she repeatedly said that she did not. She stated several times that her only criticism was that Nurse Padgett should have intervened to discontinue the administration of Pitocin. She declined to expand her criticisms even when counsel probed whether she had any other opinions relating to the care provided by the hospital that had not yet been covered in the deposition.

Shortly before trial, the hospital filed a motion in limine to exclude evidence relating to allegations of negligence (other than a theory of *respondeat superior*) against Baxter Regional Medical Center. The hospital argued that the Csiszers had failed to meet the requirements of § 16-114-206, because neither Nurse Eagon nor another projected defense witness was prepared to offer opinions regarding the alleged independent negligence of the hospital. The district court granted the motion. On the third day of trial, the Csiszers requested that they be permitted to examine Nurse Eagon on the hospital's negligence, but the district court adhered to its pretrial ruling and excluded her testimony on this issue.

The district court did not abuse its broad discretion in ruling that Nurse Eagon could not provide qualified expert testimony regarding negligence by the hospital. Although Eagon's written report expressed the view that the hospital had acted negligently, she retreated from that opinion in her deposition, and declined to express

any criticism of the institution, despite several opportunities to do so. The district court did not abuse its discretion by excluding her testimony, because the record reflected that Nurse Eagon either had repudiated the conclusions expressed in her written report, or at a minimum, had not developed her conclusions to the point where she could provide a qualified expert opinion at trial. Without expert testimony to support the allegation of negligence against the hospital, as required by § 16-114-206, the district court acted appropriately in excluding evidence relating to alleged institutional negligence.

IV.

Finally, the Csiszers contend that the district court mishandled several aspects of jury selection and oversight. Their primary complaint is that the district court, by choosing to examine prospective jurors itself, denied the parties an opportunity for effective voir dire. We reject this contention. "The conduct of voir dire is generally left to the trial court's sound discretion." *Nicklasson v. Roper*, 491 F.3d 830, 835 (8th Cir. 2007). Federal Rule of Civil Procedure 47(a) expressly permits a district court to conduct voir dire itself. The rule further provides that "[i]f the court examines the jurors, it must permit the parties or their attorneys to make any further inquiry it considers proper, or must itself ask any of their additional questions it considers proper." The district court complied with the rule. Although the court denied the Csiszers' request for attorney participation in voir dire, it invited submissions from counsel regarding areas into which they wished the court to inquire. The court also invited each attorney to approach the bench during voir dire to suggest additional areas of inquiry not covered by the court. The district court conducted voir dire in accordance with Rule 47 and within the bounds of its broad discretion.

The Csiszers also argue that the district court erred in denying their motion for a mistrial, after a member of the gallery (later identified as Dr. Wren's niece) winked at Juror 29, and the juror waved back to her. During an in-chambers conference about

-13-

the interaction, the juror explained that he recognized the young woman, whom he had not seen for a couple of years, as an employee of his former bank. In an abundance of caution, the court dismissed Juror 29. The court then informed the remaining jurors that Juror 29 had been excused – telling them that he had done nothing wrong, but declining to provide any further information about the reason for the dismissal – and the trial continued for several more days. There is no evidence that the dismissal of Juror 29 in the middle of this lengthy trial inappropriately affected the jury's deliberations or verdict. The court did not abuse its discretion in denying the request for a mistrial.

For the same reasons, we hold that the district court did not err in denying the Csiszers' request to interview jurors after the close of trial. The Csiszers argued that the circumstances prompting the dismissal of Juror 29 demonstrated that outside influences were brought to bear on the jury, and they requested permission to interview the jurors in order to identify the impact and extent of the alleged outside influences. The district court, citing the jury's obvious attentiveness during trial and its lengthy deliberation, found the Csiszers' contentions to be without merit and denied the motion. Again, we see no evidence of inappropriate influence on the jury. The district court's considered judgment was sound.

*     *     *

The judgment of the district court is affirmed.

_____