PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TILMON C. GOLPHIN,
          *Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,
          *Respondent-Appellee.*

No. 07-8

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Louise W. Flanagan, Chief District Judge.
(5:04-hc-00201-FL)

Argued: December 4, 2007

Decided: March 7, 2008

Before WILLIAMS, Chief Judge, and WILKINSON and
MICHAEL, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Williams wrote the opinion, in which Judge Wilkinson and Judge Michael joined.

---

## COUNSEL

**ARGUED:** Kenneth Justin Rose, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Jonathan Porter Babb, Sr., Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for

Appellee. **ON BRIEF:** Thomas H. Johnson, Jr., GRAY, JOHNSON, BLACKMON, LEE & LAWSON, L.L.P., Greensboro, North Carolina, for Appellant. Roy Cooper, Attorney General, Raleigh, North Carolina, for Appellee.

---

**OPINION**

WILLIAMS, Chief Judge:

On September 23, 1997, at approximately 12:38 p.m., Deputy Kelly Curtis of the Cumberland County, North Carolina, Sheriff's Department arrived at Exit 52 on Interstate 95 ("I-95") near Fayetteville, North Carolina to provide backup for a traffic stop. Once at the scene, Deputy Curtis saw that Trooper Lloyd E. Lowry of the North Carolina Highway Patrol and Deputy David Hathcock of the Cumberland County Sheriff's Department had been shot, and he radioed his dispatcher "Officers down. Officers down." *State v. Golphin*, 533 S.E.2d 168, 185 (N.C. 2000). A North Carolina jury convicted Tilmon Charles Golphin Jr. ("Tilmon") and his younger brother Kevin Salvador Golphin ("Kevin") of the murders of Trooper Lowry and Deputy Hathcock. Tilmon brings this 28 U.S.C.A. § 2254 (West 2006) proceeding, raising two issues regarding his underlying convictions. Because we conclude that the Supreme Court of North Carolina did not unreasonably apply the clearly established federal law of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that any unreasonable application of *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981), did not have a substantial and injurious effect on the jury verdict, we affirm the district court's denial of Tilmon's § 2254 petition.

I.

A.

In fall of 1997, Tilmon and Kevin, aged 19 and 17, were living with their grandparents in Greeleyville, South Carolina, having left their mother's home in Richmond, Virginia. On the morning of September 23, 1997, Tilmon and Kevin caught a ride with their cousin

Demetric Mack into the downtown area of nearby Kingstree, South Carolina. During the drive, Mack noticed that Kevin was concealing a firearm that was later determined to be a Russian-made SKS semi-automatic rifle in a white towel. Tilmon was not armed and was carrying a book bag.

Around 10:00 a.m., the brothers entered the offices of Financial Lenders, a finance company located in downtown Kingstree. Kevin entered brandishing the SKS rifle, pointed it at one of the employees, Ava Rogers, and demanded her car keys. She gave him the keys, and the brothers then ordered Rogers and a second employee into the bathroom at the back of the store. Kevin followed the women into the bathroom and told them to turn around and face the wall. Both women reported hearing clicking sounds from the rifle while they stared at the wall. After several minutes of silence, the women then heard a vehicle leave the parking lot located behind the building; they exited the bathroom and called 911. Rogers quickly discovered that someone had removed her wallet from her purse, and that her car, a 1996 dark green Toyota Camry, was missing. The Kingstree Police Department responded to the 911 call, and after obtaining a description of the suspects, issued a "BOLO"[1] for the suspects and the vehicle. The license plate and vehicle description were also entered in the National Crime Information Center ("NCIC") database.

That day, Trooper Lowry was patrolling northbound I-95 in Cumberland County, North Carolina. At approximately 12:30 p.m., Trooper Lowry stopped a dark green Toyota Camry at Exit 52 on I-95 because the driver was not wearing his seatbelt. Lowry approached the driver's side of the vehicle and instructed the driver, Kevin, to sit in the front seat of his patrol car while he performed a routine vehicle registration check. Although Kevin was driving the car, he gave Trooper Lowry Tilmon's South Carolina driver's license. After Trooper Lowry sent the registration check, the dispatcher responded with a coded message that the vehicle was stolen. Trooper Lowry requested assistance and told Kevin to exit the vehicle and place his hands on the patrol car. Trooper Lowry then pointed his service weapon at Tilmon, who was in the passenger seat of the Camry. By this time, Deputy Hathcock had arrived at the scene and parked his

---

[1]"BOLO" stands for "Be on the Lookout For."

patrol vehicle parallel to Trooper Lowry's vehicle. Deputy Hathcock then made his way to the passenger side of the Camry and removed Tilmon from the car. Deputy Hathcock patted Tilmon down and began walking him toward Trooper Lowry's vehicle.

At the same time, Trooper Lowry unsuccessfully attempted to place Kevin under arrest, but instead he and Kevin began struggling with each other. Kevin and Trooper Lowry fell to the ground, scuffling, and Trooper Lowry requested that Deputy Hathcock use his pepper spray on Kevin in an effort to subdue him. Deputy Hathcock was holding Tilmon by his left arm near the rear of the Camry at this point. Deputy Hathcock complied, sprayed Kevin, and then attempted to spray Tilmon. Before he could be sprayed, however, Tilmon knocked the canister from Deputy Hathcock's hand and ran back to the Camry, where he removed the SKS rifle from the backseat and then turned to face Deputy Hathcock. Tilmon looked Deputy Hathcock in the eye and fired the rifle, striking Hathcock several times in the abdomen and chest.

Tilmon then moved to the back of the patrol car where Trooper Lowry was on top of Kevin, still attempting to subdue him. Tilmon moved alongside Trooper Lowry and fired the rifle into his side at close range, causing Trooper Lowry to fall face-first to the ground. Tilmon retrieved Deputy Hathcock's service weapon and entered the Camry on the driver's side. Kevin, meanwhile, removed Trooper Lowry's service weapon, and while Trooper Lowry was still lying face down in the grass, shot him multiple times in the back. Afterwards Kevin ran to the passenger side of the Camry, entered the car, and sped away from the scene with Tilmon.

Several passing motorists witnessed these events, including Dana Blecke, a former emergency medical technician who passed the scene traveling southbound and saw someone lying in the grass in front of a highway patrol vehicle. She also witnessed a black male running toward the driver's side of a car parked in front of the patrol vehicle. Blecke slowed her vehicle, turned around in the median, and returned to the patrol car. By this point, the other car she had noticed was gone. Blecke stopped her vehicle and attended to the individual she had seen lying in the grass, who was later identified as Deputy Hathcock, and assessed that he had no pulse. Deputy Curtis soon arrived

at the scene. At 12:39 p.m. Deputy Curtis radioed dispatch "Officers Down. Officers Down," and requested immediate assistance. Together Blecke and Deputy Curtis then attended to Trooper Lowry, whom they found face down in front of his vehicle. They rolled Trooper Lowry over to examine him, but unfortunately found no sign of life.

Meanwhile, Tilmon and Kevin continued northbound on I-95. Another motorist who had witnessed the roadside events, Ronald Waters, had pulled off the road, called 911, and then pulled back onto the road when he saw the dark green Camry drive past him. Waters followed the Camry as he talked to the 911 operator, relaying the vehicle's movements. Several miles later, at Exit 55, the Camry exited and Waters followed. Kevin and Tilmon drove down a small dirt road where they switched drivers and removed the Camry's South Carolina license plate. Although Waters did not pursue them down this road, he stopped on the on-ramp and monitored their progress while continuing to speak with the 911 operator. The brothers then drove the Camry to a bridge overlooking I-95 before turning around and driving toward Waters. When Waters saw the barrel of a rifle pointing out of the Camry, he dropped his phone, ducked down in his seat, and hit the accelerator. He heard three shots, but he was unable to flee the scene because the shots had disabled his vehicle. Waters kept his head down until he heard an engine revving. Believing that the Camry had left, Waters raised his head. He then saw the Camry almost parallel with his vehicle, no more than six feet away, with Tilmon pointing the rifle at him through the Camry's passenger window. Tilmon smiled at him and then pulled the trigger, but the rifle clicked and did not fire. Tilmon stopped smiling, and the Camry sped away. Waters was left physically unharmed.

After their encounter with Waters, Tilmon and Kevin reentered I-95 at Exit 55 heading north. A high speed chase began at Exit 65, where a highway patrol vehicle attempted to intercept the Camry. The chase continued at speeds approaching 120 miles per hour until Exit 71, when Kevin attempted to exit, missed the turn, and rolled the car over an embankment where it landed on its wheels. Tilmon and Kevin ran from the vehicle into an adjacent wooded area. Officers from the Harnett County Sheriff's Department, the Cumberland County Sheriff's Department, the Dunn Police Department, and the North Caro-

lina Highway Patrol immediately began searching the area. Both Tilmon and Kevin were captured shortly thereafter. Deputy Hathcock's weapon, a Glock 9-millimeter handgun, was found beside Tilmon when he was arrested; Trooper Lowry's weapon, a Beretta .40-caliber handgun, was found under the steps of a home near where Kevin was apprehended. It was in a cocked position, ready to fire, and only five of the eleven cartridges remained in the weapon. In addition, police recovered an SKS rifle from the wrecked Camry and Tilmon's driver's license from the front seat of Trooper Lowry's vehicle.

Autopsies were subsequently performed on both Trooper Lowry and Deputy Hathcock. Trooper Lowry's autopsy revealed that he was shot at least seven or eight times, with the autopsy examiner concluding that several of the shots had been fired from close range. Three .40-caliber bullets and one 7.62 millimeter bullet from the SKS rifle were recovered from his body, and an additional bullet from the SKS rifle was recovered from his body bag. The autopsy concluded that Trooper Lowry suffered potentially fatal wounds from both the Beretta handgun and the SKS rifle. Deputy Hathcock's autopsy report provided similar grisly findings, with the autopsy examiner concluding that Deputy Hathcock had been shot four times in the chest and abdomen and once in the wrist. The autopsy reported that any of the four wounds to his chest and abdomen would have been fatal; those wounds were caused by bullets from both the Beretta handgun and the SKS rifle. Trooper Lowry was survived by his wife and two daughters, Deputy Hathcock by his wife and three sons.

Following their arrest, Kevin and Tilmon were transported to the Cumberland County Sheriff's Department. Kevin waived his juvenile rights and gave a statement to the police. Kevin admitted that he and Tilmon stole the Camry in Kingstree, South Carolina, and that they were traveling to Richmond, Virginia. As to the events on I-95, Kevin provided the following information:

> A state trooper pulled them over in North Carolina. The trooper asked Kevin for his license, and Kevin gave him Tilmon's South Carolina license. The trooper told Kevin he was stopped for not wearing a seat belt and asked him to get out of the Camry and sit in the patrol vehicle. Kevin saw the trooper typing on his computer and talking into his tele-

phone. Kevin heard the trooper ask for another car to come and assist him.

Kevin stated that he saw a different kind of police car drive up beside the trooper's car and that a police officer wearing a different uniform got out and came over to the trooper's car. The trooper got out of the car and told Kevin to "sit tight." The trooper then came around to the passenger side where Kevin was sitting, pulled out his pistol, opened the door, and ordered Kevin out of the car. Kevin said that he got out and put his hands on the hood of the car. The trooper told the other police officer to "get the guy" in the Camry. Kevin asked why he was being arrested and was told to "shut up." The trooper pushed Kevin's head down and put him in an arm lock. Kevin stated that he resisted and tried to get free. The trooper pushed Kevin to the ground. The other officer brought Tilmon back toward the trooper's car. The trooper told the other officer to spray Kevin with pepper spray. The other officer sprayed Kevin, and Kevin began screaming and kicking at the other officer. At that point, Kevin heard gunshots. His eyes began to clear, and he saw the two police officers on the ground. The trooper tried to grab Kevin, but he shook the trooper away. Kevin then took the trooper's pistol.

At first, Kevin did not admit shooting the trooper's pistol and claimed not to have shot any gun that day. After being told that .40-caliber shell casings had been found at the scene and that gunshot residue tests had been performed on his hands, Kevin admitted firing the trooper's handgun. He said he did not know how many times he shot the gun, but it was pointed at the trooper when he did so.

After he fired the gun, Kevin got into the passenger seat of the Camry, and he and Tilmon drove north on I-95. He and Tilmon left the interstate at the next exit and stopped on top of a bridge where they switched places. Kevin continued driving north on I-95, and they were chased by several police cars. Kevin said that he tried to get away, but

wrecked the car when he attempted to exit the interstate. He and Tilmon ran from the car, but both were caught.

Later in the interview, Kevin admitted that Tilmon had shot at a Jeep that was following them on I-95 and that had stopped at the same exit where they switched drivers. Kevin said that Tilmon told him he was trying to shoot at the tires of the vehicle. Kevin also admitted that Tilmon never shot the trooper's handgun and that Tilmon never had the trooper's handgun in his possession.

*Golphin*, 533 S.E.2d at 187.

Tilmon was also taken into custody and interviewed by the police. His time at the police station proceeded as follows:

Tilmon was interviewed at the sheriff's department by Special Agent Neil Godfrey of the SBI and Detective Mike Casey of the Cumberland County Sheriff's Department. Agent Godfrey advised Tilmon of his rights, and Tilmon asked to speak with an attorney. Tilmon was informed that investigators could no longer talk with him because he had requested an attorney, but they asked him several biographical questions. After he answered the questions, Tilmon stated he wanted to tell the investigators what had happened.

Tilmon's description of the events was very similar to Kevin's. When the Camry was pulled over by the state trooper, the trooper told them he had pulled them over because Kevin was not wearing his seat belt. Kevin and the trooper went back to the trooper's car while Tilmon waited in the Camry. Eventually, he saw another police car pull up beside them. He saw the other officer get out and walk toward the trooper's car. He then saw Kevin and the trooper at the back of the trooper's vehicle, and Kevin was pushed up against the vehicle. Tilmon got out of the Camry and walked back toward them. The other officer came toward him, pushed him up against the Camry, and patted him down. The officer then walked with him back toward the trooper's car where Kevin and the trooper were on the

ground struggling. Tilmon said he heard Kevin say that he could not breathe. The trooper then told the other officer to spray Kevin with pepper spray. The officer sprayed Kevin and then turned to spray Tilmon. Tilmon knocked the canister from the officer's hand and ran back toward the Camry. He got the rifle from the backseat of the car. Tilmon said he pointed the rifle directly at the other officer who was about nine to twelve feet away; looked him right in the eyes; and shot him. Tilmon said the other officer appeared to be dead. He then walked over to where the trooper was on top of Kevin, aimed at the trooper's side, and shot him. Tilmon said he aimed at the trooper's side because he did not want to kill him. Tilmon then ran over to the other officer, took the handgun from his holster, and went to the driver's side of the Camry. He and Kevin drove north on I-95 for a few miles, then exited and switched places. Tilmon stated he shot at the tires of a vehicle that had been following them. He and Kevin then continued driving north on I-95 and were captured a short while later after they were chased by other police cars.

Tilmon originally stated that he had not fired a gun that day but later admitted that he "probably had" shot a gun but could not remember doing so. Subsequently, Tilmon was able to recount how the rifle "jumped" as he shot the trooper. Tilmon also made no mention of the use of pepper spray by either officer but later remembered that the trooper told the other officer to spray Kevin. Additionally, Tilmon said nothing about his encounter with Waters during the first portion of his interview, but later described shooting at the tires of the Jeep in detail.

*Golphin*, 533 S.E.2d at 187-89.

During their pretrial detention, police intercepted letters from both Tilmon and Kevin containing incriminating statements. For instance, prison authorities intercepted a letter sent from Tilmon to a former juvenile boot camp associate in which Tilmon stated:

YO MAN YOU STILL CRAZY? I DON'T CARE WHAT ANY BODY SAY I AIN'T CRAZY. THOSE F*CKING

> PORK CHOPS DESERVE THAT SHIT. THE BEAST (POLICE) TRY TO F*CK ME AND MY BROTHA UP. SO I JUST DID WHAT I HAD TO DO. I AIN'T TRYING TO GO OUT LIKE RODNEY KING. SO I SMOKED THEM MOTHAF*CKAS. COP KILLA CK 1x8x7. . . . MAN, I AM GLAD THA WORLD IS COMING TO AN END. I WILL BE OUT BY THA YEAR 2000, SO F*CK THIS WHITE-BOY COUNTRY. AMERICA IS ONLY FOR WHITE PEOPLE, AND WHITE PEOPLE ONLY.

(J.A. at 690-91.)

Tilmon signed the letter "TILMON AKA RASILMON." (J.A. at 692.) Kevin also wrote a colorful letter in which he indicated he was on trial "FOR THE MURDER OF TWO BEAST." (J.A. at 706.) The letter is signed "JAH RASTAFARI." (J.A. at 707.)

The State introduced evidence, from prison inmate Shaquan Sneed, who was housed near Tilmon, to explain the context of these letters. According to Sneed's testimony, Tilmon intended to kill Waters because "they had to kill the witness." (J.A. at 712.) Tilmon referred to his shooting of the police officers as firing at "Babylon." (J.A. at 713.) As Sneed further explained: "Caucasian[s] run America. So, basically you're speaking on the swine, you speaking on the white man, you speaking on the Caucasian man, you speaking on Babylon, you speaking on the USA, you speaking on the beast." (J.A. at 713.) Sneed went on to testify that Tilmon was a Rastafarian,[2] a "buffalo soldier" or "fearless black man," (J.A. at 714), and that the year 2000 had significance for Rastifarians because, in Rastafarian belief, 2000 was the year of Armageddon in which the black man would rise up and overthrow Caucasians as the rulers of America. Tilmon had told Sneed, in reference to the deaths of Trooper Lowry and Deputy Hathcock, "That's two less [Caucasians] we got to kill. Yo, that's two less Babylon we got to destroy." (J.A. at 718.)

---

[2]Rastafarianism is "a religious movement among black Jamaicans that teaches the eventual redemption of blacks and their return to Africa, employs the ritualistic use of marijuana, forbids the cutting of hair, and venerates Haile Selassie as a god." *Merriam-Webster's Collegiate Dictionary* 1031 (11th ed. 2004).

B.

On December 1, 1997, the State of North Carolina indicted Tilmon and Kevin on two counts of first-degree murder,[3] two counts of robbery with a dangerous weapon, one count of assault with a deadly weapon with intent to kill, one count of discharging a firearm into occupied property, and one count of possession of a stolen vehicle. Following the denial of a motion to sever, the brothers were tried jointly in a capital proceeding in Cumberland County. Prior to trial, Tilmon moved to suppress the statement that he made to the police during his booking, which the trial court denied following a hearing on February 23, 1998. Due to the amount of pretrial publicity generated by the case, the Golphins' jury was drawn from a special venire selected from nearby Johnston County.[4]

Tilmon authorized his attorneys to make several admissions during the trial. During opening arguments, Tilmon authorized his attorneys to admit that he fired shots from an SKS rifle that struck Deputy Hathcock, Trooper Lowry, and the vehicle of Ronald Waters, and that he was in possession of a stolen car. Tilmon further authorized his attorneys to admit his guilt of second degree murder during closing arguments. Following a jury trial, the brothers were found guilty on all charges. Thereafter, on May 13, 1998 following a capital sentencing proceeding conducted pursuant to N.C. Gen. Stat. § 15A-2000 (2007), both were sentenced to death for each murder.[5] In recom-

---

[3]With respect to the charge of first-degree murder, the indictment alleged that Tilmon and Kevin "unlawfully, willfully and feloniously did of malice aforethought kill and murder" Trooper Lowry and Deputy Hathcock. (J.A. at 7.)

[4]Although there is a slight amount of confusion on this point, it appears that Tilmon's and Kevin's attorneys stipulated to choosing the jury from a county other than Cumberland County and that the trial judge then chose Johnston County. According to the 1990 census, Johnston County was composed of 80% white residents and 17.5% black residents. Cumberland County, where the murders occurred, was composed of 60% white residents and 31.8% black residents. In any event, the trial court's use of a Johnston County jury is not an issue in this case.

[5]Kevin was seventeen at the time of the events leading to his death sentence, so his sentence was reduced to life imprisonment without the

mending the death sentence for Tilmon, the jury found four statutory aggravating factors for each murder: that the capital felony (1) was committed for the purpose of avoiding or preventing a lawful arrest; (2) was committed while Tilmon was engaged in flight after committing robbery; (3) was committed against a law-enforcement officer while engaged in the performance of his official duties; and (4) was part of a course of conduct in which Tilmon engaged in other crimes of violence against another person. In contrast, the jury found just one of four statutory mitigating factors: Tilmon's age at the time of the crime. It found none of the thirty-seven non-statutory mitigating factors.

In addition to the two death sentences, the trial court sentenced Tilmon and Kevin to the following consecutive terms of imprisonment: (1) for possession of a stolen vehicle, a minimum of six months and a maximum of eight months; (2) for assault with a deadly weapon with intent to kill, a minimum of thirty-one months and a maximum of forty-seven months; (3) for discharging a firearm into occupied property, a minimum of thirty-one months and a maximum of forty-seven months; and (4) for each count of robbery with a dangerous weapon, a minimum of eighty months and a maximum of one hundred and five months. *Golphin*, 533 S.E.2d at 183.

The brothers appealed directly to the Supreme Court of North Carolina which, in a thorough and lengthy published opinion, affirmed their convictions and sentences. *Golphin*, 533 S.E.2d at 183-248. The United States Supreme Court denied certiorari. *Golphin v. North Carolina*, 532 U.S. 931 (2001). On January 31, 2002, Tilmon filed a motion for appropriate relief ("MAR") in the North Carolina Superior Court pursuant to N.C. Gen. Stat. § 15A-1415 (2007). The Superior Court denied him relief in full on May 9, 2003. Tilmon then filed a

---

possibility of parole in the wake of *Roper v. Simmons*, 543 U.S. 551 (2005). In *Roper*, the Supreme Court held that it was cruel and unusual punishment in violation of the Eighth Amendment to execute persons for crimes committed before the age of eighteen. *Id.* at 578. Kevin has not pursued habeas relief before the court at this time, and only Tilmon's claims are before us. Accordingly, any mention or discussion of Kevin is limited to background information.

petition for writ of certiorari with the Supreme Court of North Carolina, which was denied on July 9, 2003.

On May 24, 2004, Tilmon timely filed a petition for habeas corpus under 28 U.S.C.A. § 2254 in the United States District Court for the Eastern District of North Carolina, raising twenty-five grounds of error. On September 16, 2004, acting pursuant to Rule 4 of the Rules Governing Section 2254 Cases, the district court dismissed two claims because "it [wa]s plainly apparent from the face of the petition that the petitioner [wa]s not entitled to relief on the grounds asserted." (J.A. at 1108.) The district court ordered the State to respond to the remaining twenty-three claims. The State filed its response and an accompanying motion for summary judgment on November 15, 2004.

After denying Tilmon's request for an evidentiary hearing, the district court granted summary judgment in favor of the State and dismissed Tilmon's § 2254 petition in full on March 13, 2007. The court subsequently granted Tilmon's motion to extend the time to file an appeal, and Tilmon timely noted an appeal on June 1, 2007. On June 19, 2007, the district court granted Tilmon a certificate of appealability ("COA") as to seven of the claims raised in his § 2254 petition. Before this court, Tilmon has limited his argument to two issues: (1) whether the Supreme Court of North Carolina unreasonably applied the U.S. Supreme Court's decision in *Batson*; and (2) whether the Supreme Court of North Carolina unreasonably applied the U.S. Supreme Court's decisions in *Miranda* and *Edwards* in upholding the admission of his confession into evidence.

## II.

We review *de novo* the district court's decision to deny Tilmon's § 2254 petition based on the record before the Supreme Court of North Carolina, applying the same standards as did the district court. *Whittlesey v. Conroy*, 301 F.3d 213, 216 (4th Cir. 2002). Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the scope of our review in cases on collateral review from a state court proceeding that adjudicated a claim on the merits is both deferential and highly constrained. Under AEDPA, we may grant Tilmon's petition only if the state court decision was either con-

trary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. 28 U.S.C.A. § 2254(d)(1).

A state court decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court adjudication is an unreasonable application of clearly established federal law when the state court "identifies the correct governing legal rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular . . . case," *id.* at 407, or "applies a precedent in a context different from the one in which the precedent was decided and one to which extension of the legal principle of the precedent is not reasonable or fails to apply the principle of a precedent in a context where such failure is unreasonable," *Robinson v. Polk*, 438 F.3d 350, 355 (4th Cir. 2006) (internal quotation marks and citation omitted). The state court's application of clearly established federal law must be "objectively unreasonable," and "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 410, 411. The phrase "clearly established federal law" refers "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions *as of the time of the relevant state-court decision*." *Id.* at 412 (emphasis added).[6]

Also, pursuant to § 2254(e)(1):

> In deciding whether a petitioner has demonstrated the deficiency of the state court adjudication under § 2254(d), federal courts must presume state court findings of fact to be correct unless the petitioner rebuts that presumption by clear and convincing evidence.

---

[6]Tilmon does not argue that the Supreme Court of North Carolina acted contrary to clearly established federal law, and we therefore focus solely on whether that Court unreasonably applied clearly established federal law.

*Buckner v. Polk* 453 F.3d 195, 198 (4th Cir. 2006)

Although AEDPA deference is certainly a difficult standard to overcome, "[t]he standard is demanding but not insatiable; . . . '[d]eference does not by definition preclude relief.'" *Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 240 (2005) (quoting *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 340 (2003)).

## III.

Tilmon's first claim before us is that the Supreme Court of North Carolina unreasonably applied *Batson* in concluding that the prosecution's peremptory challenges of two prospective African-American jurors, Deardra Holder and John Murray, did not violate his equal protection rights. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution forbids the use of peremptory challenges for a racially discriminatory purpose. *Batson*, 476 U.S. at 86.

*Batson* created a three-step process for evaluating claims, like Tilmon's, that a peremptory challenge was used in a discriminatory manner.

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991).

As a matter of North Carolina state law, when the trial court does not explicitly rule on whether the defendant made a *prima facie* case under step one, and the State proceeds to the second prong of *Batson* by articulating its explanation for the challenge, the question of whether the defendant established a *prima facie* case becomes moot. *See State v. Williams*, 471 S.E.2d 379, 386 (N.C. 1996).

As to the prosecutor's burden under the second step, the Supreme Court has explained that, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez*, 500 U.S. at 360; *see also Purkett v. Elem*, 514 U.S. 765, 769 (1995) (holding that "[w]hat it means by a 'legitimate reason' is not a reason that makes sense, but a reason that does not deny equal protection").

Finally, at *Batson*'s third step,"[t]he trial court [has] the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98. Because a "judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Id.* at 98 n.21; *Hernandez*, 500 U.S. at 364. Thus, a finding of no discrimination is a factual finding that we review for clear error. *Hernandez*, 500 U.S. at 364-65.

In *Miller-El II*, the Supreme Court clarified and reiterated that, at this third-step, "a defendant may rely on *all relevant circumstances* to raise an inference of purposeful discrimination." *Miller-El II*, 545 U.S. at 240 (internal quotation marks omitted) (emphasis added). The Court also clarified that, at this third step, a defendant does not have to point to an identical juror of another race who was not peremptorily challenged: "[n]one of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one." *Id.* at 247 n.6; *see also Coulter v. McCann*, 484 F.3d 459 (7th Cir. 2007) ("In *Miller-El II*, the Court clarified the way in which jurors of different races should be compared. It called for direct comparisons between 'similarly situated' venirepersons of different races."). This approach makes intuitive sense, for, as the Court explained, "potential jurors are not products of a set of cookie cutters." *Miller-El II*, 545 U.S. at 247 n.6.

The *Miller-El II* Court also reiterated that reviewing courts cannot create race-neutral explanations for the prosecution: "It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he

gives." 545 U.S. at 252 (citation omitted). "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." *Id.* However, in reviewing the prosecutor's reasons, a court should consider "'how reasonable, or how improbable, the explanations are[ ] and . . . whether the proffered rationale has some basis in accepted trial strategy.'" *Id.* at 247 (quoting *Miller-El I*, 537 U.S. at 339).

With this framework in place, and ever mindful that AEDPA deference "does not . . . preclude relief," *id.* at 240, we turn to Tilmon's claims.

## A.   Deardra Holder

The State exercised a peremptory strike on Deardra Holder, a 22-year-old African-American female, at a time when six jurors, including one African-American, were seated on the jury and the State had used nine peremptory challenges. Of those nine challenges, three were made to strike African-Americans. During voir dire, the State discovered that Holder had an 18 year-old sister who lived in the same household and worked at the same business as she did. When asked for her views regarding the death penalty, Holder responded, after pausing for a moment, that "[i]f the death penalty was appropriate, I would see nothing wrong with it." (J.A. at 409.) Most of Holder's answers were either "Yes, ma'am" or "No, ma'am." (J.A. at 401-420.)

The State exercised a peremptory challenge against Holder for three reasons: (1) she was 22 and had a sister who was 18 and lived in the same household that she did; (2) she paused before discussing the death penalty; and (3) when the prosecutor "attempted to draw her out and to engage her in more than one-word answers or simply short-phrased answers," she was unable or unwilling to do so. (J.A. at 422.) The trial court granted the peremptory strike and denied the *Batson* challenge because "the articulated reason that the juror was relatively young and close to the age range of the defendants and that the juror had a sibling at approximately the age range of the defendants constitutes an articulable race-neutral reason for exercising a peremptory challenge." (J.A. at 427.)

In reviewing this claim, the Supreme Court of North Carolina concluded that the State met its burden to offer a race-neutral reason for the strike:

> As to the second prong of *Batson*, the State provided race-neutral reasons for the peremptory challenges of both Holder and Murray. With regard to Holder, we perceive no inherent discriminatory intent in the State's explanation that Holder was young, within the age range of defendants, and had a sister who was also within the age range of defendants. Defendants have failed to show the State's reasoning was pretextual. The State relied on previous questions by defense counsel to formulate what it believed to be the defense theory in this case and then proceeded to ask questions similar to those asked by defense counsel. There was no evidence of pretext, as the State sought to exclude Holder because she might be able to empathize with defendants because she and her sister were within the same age range as defendants. Therefore, the trial court did not err in concluding that the State's reasoning was race-neutral.

*Golphin*, 533 S.E.2d at 214 (citations omitted).

In contending that the State's proffered race-neutral reasons were actually pretextual, Tilmon directs our attention to two white jurors the State did not strike, Dennis Grice and Dana Phillips, who Tilmon contends were in the same age range as Deardra Holder and had siblings in a similar age range. Grice was, according to his juror questionnaire, 23 years old and lived at home with a 13-year-old brother. Phillips was 21 years old and had a 29-year-old sister. There is no evidence in the record regarding their living arrangements at the time of trial.

## B.   John Murray

John Murray was a 31-year-old African-American male. When the State peremptorily challenged Murray, seven jurors were seated, one of whom was an African-American. The State to that point had used eleven challenges, four of which were used to strike African-Americans.

During voir dire, the State's questioning brought the following facts to light: Murray was formerly with the Air Force and held top secret security clearance; he had overheard two white jurors in the courtroom stating "[t]he defendants should have never made it out of the woods [alive]," (J.A. at 443); he believed those jurors "weren't giving much consideration to due process," (J.A. at 443); hearing such statements would not in any way prejudice him against the State; he was "an advocate of both punishments," that is, life imprisonment and the death penalty, because "they are deterrents" and "they do work," (J.A. at 455); his father was convicted of robbery when he was a child and spent four to six years in jail; he was convicted of a DUI several years prior to the trial; and that he was familiar with reggae music but not familiar with Rastafarianism as a religion. Murray also had an aunt who served as a Deputy Sheriff in Buncombe County, North Carolina.

Following voir dire, the State moved to strike Murray. Tilmon's counsel raised a *Batson* objection, noting that, to that point, almost one-third of the State's challenges had been made to strike African-American jurors. The State responded that it struck Murray for the "cumulative effect of three things." (J.A. at 474.)

> One, he has a prior conviction himself for driving while impaired. Two, his father has a prior conviction for robbery for which he served, if I remember correctly, six years in the Department of Corrections. And three, Mr. Murray's statement that he attributed to a male and a female white juror in the courtroom with respect to what he viewed as a challenge to the due process rights of the defendants. The cumulative effect of that we contend makes him challengeable by the state from our point of view peremptorily.

(J.A. at 474.)

The State then added the following bits of information: that Murray "did not refer to the Court with any deferential statement"; that, in relation to his "demeanor," Murray "had a gold earring in his left ear"; and, that the prosecutor "noted and perceived from [his] point of view a rather militant animus with respect to some of his answers." (J.A. at 475.) Explaining this last point, the prosecutor continued, "He elab-

orated on some things. Other things, he gave very short, what I viewed as sharp answers and also noted that, when he spoke to the Court, . . . [he] [d]id not address the Court as Your Honor. He just simply gave rather short, cryptic answers." (J.A. at 475.)

Defense counsel countered that a white male in the same age range as Murray, Michael Covington, had a past conviction but was not challenged and that another white juror, Virginia Broderick, had a DWI conviction. Moreover, counsel noted the State did not question Murray about his father's conviction and what impact that would have upon him as a juror and argued that the comments of the white jurors could not reflect upon Murray's fitness to serve.

The trial court denied the *Batson* motion. It explained as follows:

> I would just like to note for the record that I did not perceive—since this has been raised, I did not perceive any conduct of the juror to be less than deferential to the Court. I think that the juror did demonstrate a consistent reticence to elaborate on questions, but all of his responses were appropriate to the specific questions asked. And probably that—there was a substantial degree of clarity and thoughtfulness in the juror's responses.

> And the Court will note for the record that it is primarily relying upon the [juror's] prior record, specifically which it involved an interaction with a traffic law enforcement officer, and the potential empathy that might be engendered from a father who was a criminal defendant as the basis for the exercise of the peremptory challenge.

> I would note further I am not relying upon the impact of the incident in the courtroom as providing a basis for this and frankly is not—I do not consider it to be appropriate for even the exercise [of] a peremptory challenge.

(J.A. at 477-78.)

The Supreme Court of North Carolina found that this offering from the State constituted a race-neutral reason:

With regard to Murray, we perceive no inherent discrimina-
tory intent in the State's explanation that Murray had been
convicted of driving while impaired and that his father had
a prior conviction for robbery for which he had served six
years in the Department of Correction. Defendants did not
show the State's explanation to be pretextual. While defen-
dants pointed to two other Caucasian prospective jurors who
had criminal convictions and were accepted by the State,
those other prospective jurors did not also have a parent who
was convicted of robbery for which he or she was incarcer-
ated. There is no evidence of pretext, as the State sought to
exclude Murray because he might empathize with defen-
dants because of his own experience with traffic law
enforcement and his father's incarceration in the Depart-
ment of Correction. Therefore, the trial court did not err in
finding the State's reasoning to be race-neutral.

*Golphin*, 533 S.E.2d at 214 (citations omitted).

To support his argument that the peremptory strike of Murray was
pretextual, Tilmon points out that the State did not strike at least six
white jurors with criminal records or relatives with criminal records.
In particular, Tilmon directs our attention to Virginia Broderick, a
white female who was passed by the State and whose sister and
brother-in-law were drug addicts who had recently been arrested for
passing bad checks. Broderick had custody of their 15-year-old
daughter. When asked about her sister and brother-in-law, however,
Broderick stated that "[w]e don't have any contact with them." (J.A.
at 358.) Broderick had also been convicted of driving while under the
influence of alcohol, for which her driver's license was suspended for
one year. Broderick stated that her own conviction, which had
occurred about four years earlier, would not impact her ability to
serve as a juror. She had, in fact, served as a juror in a civil case in
1996.

Tilmon additionally supports his argument that the strikes of
Holder and Murray were pretextual by noting that the State ques-
tioned two African-American jurors, Murray and Phillip Barnhill,
about Rastafarianism but did not question white jurors on that topic.

Tilmon also points us to the statistical evidence regarding the jury's composition. The 95-person venire panel included thirteen African-Americans. Of the thirteen prospective African-American jurors, six were excused for cause, five were peremptorily struck by the State, one was struck by Kevin's counsel, and one served on the jury. Thus, the State struck 5 of the 7 eligible black jurors, or 71%.[7] In total, the State struck 14 of 31 eligible white jurors, or 45%.

The Supreme Court of North Carolina offered the following analysis in ultimately rejecting Tilmon's *Batson* claim:

> As the State provided race-neutral reasons for its peremptory challenges of Holder and Murray, we move to the third prong of *Batson*. In light of the factors we consider in evaluating whether there is purposeful discrimination, we note that this case may be one susceptible to racial discrimination because defendants are African-Americans and the victims were Caucasian. *See White*, 349 N.C. at 548-49, 508 S.E.2d at 262. However, the State did not exhaust the statutory number of peremptory challenges allowed for the first twelve jurors, nor did it exhaust its challenges in selecting the four alternate jurors. *See* N.C.G.S. § 15A-1217; *White*, 349 N.C. at 548-49, 508 S.E.2d at 262. In addition, based on the discussion which occurred at the time the State challenged Holder, the State had exercised nine peremptory challenges, only three of which were against African-Americans; the next day, when Murray was challenged, the State had exercised eleven peremptory challenges, only four of which were against African-Americans, one being Holder. The State had accepted six prospective jurors, one of whom was African-American. This constituted a higher percentage of African-Americans accepted by the State than were in the jury pool. In selecting the twelve jurors and four alternates, the State exercised twenty-seven peremptory challenges, only four of which were against African-

---

[7]On direct appeal, the Supreme Court of North Carolina concluded that the State used its peremptory challenges on 4 of the 7 eligible black jurors, or 57%. Before this court, the State agrees that the correct number is 5 of 7.

Americans. This ratio represents a percentage of African-Americans equivalent to the percentage of African-Americans in the jury pool. Moreover, during jury selection, the State made no comments which would support an inference of discrimination in the instant case.

From our review of the transcript in the instant case, it is apparent the trial court gave great consideration to the arguments by all parties with regard to these two *Batson* challenges before concluding the State did not purposefully discriminate against Holder or Murray. We give great deference to the trial court's rulings. *See Bonnett*, 348 N.C. at 433, 502 S.E.2d at 575. Given the foregoing, we are convinced the State did not discriminate on the basis of race in exercising its peremptory challenges against Holder and Murray. *See Kandies*, 342 N.C. at 434-35, 467 S.E.2d at 75. Defendants' assignments of error are overruled.

*Golphin*, 533 S.E.2d at 214-15.

## C.

Based on the record before us, we conclude that the Supreme Court of North Carolina reasonably applied *Batson* in concluding that the jury selection did not violate Tilmon's equal protection rights. A significant portion of Tilmon's argument is grounded in the Court's recent decision in *Miller-El II*, and, before we turn specifically to Tilmon's claim, we believe a detailed exploration of *Miller-El II* is helpful in deciding this case.[8]

---

[8]We find a detailed exploration of *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*"), particularly instructive given that the Supreme Court has vacated and remanded two of our prior decisions, *Kandies v. Polk*, 385 F.3d 457 (4th Cir. 2004), *vacated*, *Kandies v. Polk*, 545 U.S. 1137 (2005), and *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated*, *Barnette v. United States*, 546 U.S. 803 (2005), for further consideration in light of *Miller-El II*. The present case represents our first opportunity to explore the import of *Miller-El II* to our *Batson* jurisprudence.

*Miller-El II* involved a defendant who had been convicted of capital murder in a Texas state court prior to the Supreme Court's decision in *Batson*. *Miller-El II*, 545 U.S. at 236. After *Batson* was decided, the district court and the Fifth Circuit denied Miller-El's request for a COA on the issue of whether his jury selection violated *Batson*, which the Supreme Court reversed. *Miller-El I*, 537 U.S. at 348. The Fifth Circuit then denied relief on the merits, and, again, the Supreme Court reversed. *Miller-El II*, 545 U.S. at 266. In granting habeas relief, the Supreme Court focused on the following factors. First, "[t]he numbers describing the prosecution's use of peremptories [were] remarkable." *Miller-El II*, 545 U.S. at 240. Indeed, "[t]he prosecutors used their peremptory strikes to exclude 91% [10 of 11] of the eligible African-American venire members. . . . Happenstance is unlikely to produce this disparity." *Miller-El I*, 537 U.S. at 342. In addition, "side-by-side comparisons of black panelists who were struck and white panelists allowed to serve" pointed to discrimination because "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Miller-El II*, 545 U.S. at 241. Thus, although the prosecution had offered a race-neutral explanation for striking some jurors, its "plausibility [was] severely undercut by the prosecution's failure to object to other panel members who expressed views much like [the challenged black jurors']." *Id.* at 248. Specifically, the prosecutors struck two black jurors for hesitancy about imposing the death penalty even though their statements indicated no such hesitancy and the prosecutor's new explanation after being told that he had misquoted one juror "reek[ed] of afterthought." *Id.* at 246. In fact, the Court concluded that at least one black juror whom the prosecution struck would have been an ideal juror given his views in favor of the death penalty. *Id.* at 247.

Finally, and most importantly, the Court relied heavily on "broader patterns of practice during the jury selection." *Id.* at 253. The prosecution had used the technique of a "jury shuffle" to move black venirepersons to the back of the venire panel; read a "graphic script" of the death penalty to black venire members in order to get them to equivocate on the death penalty;[9] and used "trickery" in the form of ques-

---

[9]The Court included the following example of the graphic script:

I feel like you have a right to know right up front what our posi-

tions about mandatory minimum sentencing for first degree murder.[10] *Id.* at 253-63. The Court found that 53% of black jurors received the graphic script, while only 6% of white jurors received it. *Id.* at 255-56. As for the trickery, 27% of nonblacks who indicated skepticism about the death penalty received the "trick" question, while 100% of black jurors hesitant about the death penalty were asked the trick question. *Id.* at 264. Importantly, the State never "denied that disparate lines of questioning were pursued." *Id.* at 265. The Court then arrived at its final piece of evidence:

> There is a final body of evidence that confirms this conclusion. We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systemically excluding blacks from juries.

*Id.* at 263.

The Court thus concluded that Miller-El's evidence, when "viewed

---

tion is. Mr. Kinne, Mr. Macaluso and myself, representing the people of Dallas County and the state of Texas, are actively seeking the death penalty for Thomas Joe Miller-El. . . .

We do that with the anticipation that, when the death penalty is assessed, at some point Mr. Thomas Joe Miller-El-the man sitting right down there-will be taken to Huntsville and will be put on death row and at some point taken to the death house and placed on a gurney and injected with a lethal substance until he is dead as a result of the proceedings that we have in this court on this case. So that's basically our position going into this thing.

*Miller-El II*, 545 U.S. at 256 (internal quotation marks omitted).

[10]The trick question worked in the following manner. The prosecution would ask a juror what he/she believed should be the mandatory minimum sentence for murder. It first told some jurors that Texas law provided a minimum of five years. For other jurors, the prosecution would not mention the five-year minimum. If a juror then offered a term *above* five years, the prosecution would move to strike that juror for cause. *Miller-El II*, 545 U.S. at 261. The State conceded that this tactic was used to trick jurors and create cause to strike. *Id.*

cumulatively," was "too powerful to conclude anything but discrimination." *Id.* at 265. The Court explained that, in summary:

> It blinks reality to deny that the State struck Fields and Warren, included in that 91%, because they were black. The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State's pretextual positions confirm Miller-El's claim, and the prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror.
>
> The state court's conclusion that the prosecutors' strikes of Fields and Warren were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous.

*Id.* at 266.

### D.

Contrary to Tilmon's belief, *Miller-El II* did not alter *Batson* claims in any way. *Miller-El II* itself was a case under AEDPA, so the Court, simply following clearly established federal law as AEDPA requires, could not have crafted a new legal standard. Moreover, subsequent to *Miller-El II*, the Court has retained and continued to apply *Batson*'s three-step process. *See Rice v. Collins*, 546 U.S. 333, 338-39 (2006) (applying three-step *Batson* framework to claim of racial discrimination during jury selection).

Indeed, in the wake of *Miller-El II*, courts (including the Fifth Circuit, whose decision *Miller-El II* reversed) continue to deny *Batson* claims pursuant to AEDPA. *See, e.g.*, *Nicklasson v. Roper*, 491 F.3d 830, 842 (8th Cir. 2007) (finding no *Batson* violation when only evidence was side-by-side comparisons and explaining that "Nicklasson's reliance on *Miller-El* does not bolster his argument because the Supreme Court's finding of a *Batson* violation did not hinge entirely

on the closeness of the excluded black juror's testimony to that of the white, but on the 'totality of the relevant facts' pertaining to the prosecutor's conduct during the defendant's trial"); *Lewis v. Calderon*, 189 F. App'x 658 (9th Cir. 2006) (unpublished) (denying *Batson* claim when prosecution struck 6 of 7 eligible black jurors, or 86%); *Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir. 2005) (denying *Batson* claim less than one month after *Miller-El II* and explaining that "[t]he Court did not announce any new elements or criteria for determining a *Batson* claim, but rather simply made a final factual and evidentiary determination of that particular petitioner's *Batson* claim").

In deciding Tilmon's claim, we start by noting that Tilmon does not argue that the State failed to offer legitimate race-neutral reasons for striking Holder and Murray. Rather, Tilmon argues that the comparison between Holder and Murray with other white jurors the State did not strike and the State's overall conduct during jury selection show those race-neutral reasons were pretextual. Thus, we limit our review to whether the Supreme Court of North Carolina unreasonably applied the third-step of *Batson* in denying Tilmon relief.

Unlike *Miller-El II*, a side-by-side juror comparison does not tend to show pretext in this case. Holder and her sister were in the same age range as Tilmon and Kevin, who were 19 years old and 17 years old, respectively; no other juror was similarly situated. Grice was ten years older than his brother, and Phillips was eight years younger than her sister. More importantly, neither juror's siblings were in the same age range as Tilmon and Kevin. *Miller-El I* counsels that we look to whether the prosecution's purported reason has some basis in "acceptable trial strategy." *Miller-El I*, 537 U.S. at 339. The choice to challenge Holder, given her age and her closeness to her sister, certainly meets this criterion. The State asked at least three other jurors under the age of twenty-four if they had any siblings, another indication that the State was preparing for a possible defense strategy focused upon the close bond between Tilmon and Kevin.

Likewise, the State reasonably viewed Murray and Broderick in separate lights: although each had a close relative who had been incarcerated, the potential effect on Murray of growing up without a father because he was in the criminal justice system is bound to be different than the effect on Broderick of having a ne'er-do-well sister

and brother-in-law. The State reasonably could have believed that having a father who was removed from the home by the criminal justice system might leave Murray with a negative view of that system.

Finally, Tilmon's additional evidence—that the State struck 71% of eligible black jurors and asked only black jurors about Rastafarianism—is insufficient to show that the Supreme Court of North Carolina unreasonably applied *Batson*'s third step, even in light of *Miller-El II*. Although Tilmon's statistical evidence is certainly probative under *Miller-El II*, *see* 545 U.S. at 240-41, it alone cannot carry the day. *See Coulter*, 484 F.3d at 468 (denying habeas relief under *Batson* and *Miller-El II* where prosecution used 90% of its strikes against African-American jurors); *United States v. Nelson*, 450 F.3d 1201, 1209 (10th Cir. 2006) (noting that "the prosecutor's use of peremptory strikes directed at other African American venire-members is a relevant factor" but concluding "[i]t does not follow . . . that the district court was required to rule the same way with respect to each of the peremptory strikes"); *Majid v. Portuondo*, 428 F.3d 112, 131 (2d Cir. 2005) (rejecting *Batson* claim post *Miller-El II* where prosecution struck twelve of fifteen eligible black jurors and noting "the *Miller-El* decisions do not help the petitioners"). As the Seventh Circuit noted in *Coulter*, even if "it is possible that we may not have been as convinced by the record as the state trial court was in 1998, . . . that is not our role." 484 F.3d at 470.

Moreover, the questions about Rastafarianism are not indicative of pretext. The State planned to introduce evidence that Tilmon was Rastafarian, and questions about whether a juror was affiliated with this religion could have revealed a potential affinity for Tilmon. Because Rastafarianism is a religion that welcomes only individuals of African descent, it is reasonable that the State would only ask potential jurors who were African-American about any affiliation with this religion. Thus, a discriminatory motive cannot be imputed to the State merely because it asked questions of only those people that potentially could be Rastafarian.

Finally, we would be remiss if we failed to note that this case is not one in which the trial judge remained uninvolved. Instead, the record reveals a trial judge acutely aware of the potential for racial bias during jury selection. For instance, the trial judge required the

State to give its race-neutral reasons for peremptory challenges beginning with the first *Batson* challenge (to Holder). After another *Batson* challenge was raised in relation to Murray, the trial judge ruled, "I am now going to hereafter, including this time, require an articulable reason for each minority peremptorily excused if a *Batson* challenge is raised." (J.A. at 474.) As to both Holder and Murray, the trial judge accepted some of the State's race-neutral reasons, but rejected others. *See also Golphin*, 533 S.E.2d at 215 (noting that "it is apparent the trial court gave great consideration to the arguments by all parties with regard to these two *Batson* challenges before concluding the State did not purposefully discriminate against Holder or Murray"). In addition, the Supreme Court of North Carolina recognized that this case was one in which racial discrimination during jury selection was particularly possible: "we note that this case may be one susceptible to racial discrimination because defendants are African-Americans and the victims were Caucasian." *Golphin*, 533 S.E.2d at 214. Beyond their legal analysis, the care with which these courts considered Tilmon's *Batson* challenge further underscores our conclusion that we cannot grant Tilmon relief on this claim.

IV.

A.

Tilmon's second claim is that the Supreme Court of North Carolina unreasonably applied the line of cases beginning with *Miranda v. Arizona*, 384 U.S. 436 (1966), in permitting the admission of his confession at trial. In *Miranda*, the Supreme Court held that the police must advise a suspect of his right to counsel and, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474. Over fifteen years later, in *Edwards v. Arizona*, 451 U.S. 477 (1981), the Court explained that "it is inconsistent with *Miranda* and its progeny for authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485. Thus, when a suspect "expresse[s] his desire to deal with the police only through counsel," the police cannot interrogate him "until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Id.* at 484-85. And,

> [i]f the police do subsequently initiate an encounter in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.

*McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991).

The purpose of the *Edwards* rule is prevention of police "badgering or overreaching - explicit or subtle, deliberate or unintentional." *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (internal quotation marks and alteration omitted). Thus, police officers may not question a suspect despite his request for counsel "in the hope that [he] might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Id.* at 99 (internal quotation marks omitted). And, even after the suspect has spoken with counsel, "officials may not reinitiate interrogation without counsel present." *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990).

The Supreme Court has directed that two elements be examined to determine whether the police have obtained a statement in violation of *Edwards*' "rigid prophylactic rule." *Smith*, 469 U.S. at 95 (internal quotation marks omitted). First, a court must "determine whether the accused actually invoked his right to counsel." *Id.* If he did, the court must determine who initiated the further discussions that yielded the eventual statement. *See id.* If the accused, after invoking his right to counsel, did not "initiate[ ] further discussions with the police" or "knowingly and intelligently waive[ ] the right he had invoked," any statement procured by the police is inadmissible at trial. *Id.*

The Supreme Court of North Carolina rejected Tilmon's argument that admission of his confession violated *Miranda* and *Edwards*, concluding as follows:

> In the instant case, the transcript of the pretrial hearing concerning Tilmon's motion to suppress reveals that Agent Godfrey and Detective Casey questioned Tilmon on 23 September 1997. Agent Godfrey advised Tilmon of his constitu-

tional rights. Tilmon stated he wanted to talk with a lawyer. Thereafter, Agent Godfrey informed Tilmon they could not ask Tilmon about his involvement in the shootings of Trooper Lowry and Deputy Hathcock because he had requested to speak with an attorney, but Agent Godfrey told Tilmon they did need to obtain biographical information and background data for the arrest report. Subsequently, Agent Godfrey asked Tilmon for his full name, address, height, weight, next of kin, place of employment, and grade of education he had completed. Then Tilmon asked Agent Godfrey where he would be kept until his trial. Agent Godfrey responded that he would be kept in the Cumberland County jail. Tilmon then informed Agent Godfrey that he was a vegetarian and that his religion allowed him to eat only fish and prohibited anyone from cutting his hair or taking anything from his body. Agent Godfrey asked the name of Tilmon's religion so he could inform jail management in order to justify Tilmon's request. In response, Tilmon stated he was a member of the Rastafarian religion. Next, based on the belief that a video camera in Trooper Lowry's car had recorded the incident, Tilmon asked Agent Godfrey and Detective Casey why they wanted to talk about what had happened because it should have been videotaped. Agent Godfrey responded that he still needed to know why it happened. Agent Godfrey testified that at the time he made this statement, he knew there was no videotape and that neither he nor Detective Casey ever indicated to Tilmon there was a videotape. Tilmon then stated he would tell Agent Godfrey and Detective Casey why it happened. Tilmon proceeded, over a lengthy interview process which included several breaks, to make a statement concerning the shooting incident. . . .

Although Tilmon asserted his right to counsel and the police continued to ask Tilmon questions, the questions were included in the exception for questions used to elicit biographical information. In addition, it is unreasonable to say Agent Godfrey should have known his questions concerning Tilmon's biographical information were reasonably likely to elicit an incriminating response, and there was no reason

Agent Godfrey should have known his response to Tilmon's questions about where he would be housed until the time of trial would elicit an incriminating response. Moreover, Tilmon initiated the further discussion when he asked why Agent Godfrey and Detective Casey wanted to talk about the incident when it had been videotaped. Agent Godfrey merely responded to Tilmon's question that they needed to know why it happened. Nothing should have led Agent Godfrey to believe his response to the question would elicit an incriminating response.

*Golphin*, 533 S.E. 2d at 200-01 (citations omitted).

### B.

In this particular case, we believe it is unnecessary to consider whether the Supreme Court of North Carolina unreasonably applied *Miranda* and *Edwards*. Tilmon's case arises under § 2254, and we may not grant him relief for constitutional errors committed in state court absent a showing that the error "'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This approach to harmless error recognizes concerns for "federalism, comity, and finality." *Cooper v. Taylor*, 103 F.3d 366, 370 (4th Cir. 1996) (en banc). Moreover, "[r]etrying defendants whose convictions are set aside also imposes significant 'social costs' including . . . the frustration of 'society's interest in the prompt administration of justice.'" *Brecht*, 507 U.S. at 637 (quoting *United States v. Mechanik*, 475 U.S. 66, 72 (1986) (internal quotation marks omitted)).

The *Brecht* standard applies even in cases like this one, in which the state courts did not consider the harmless nature of a trial error. *Fry v. Pliler*, 127 S. Ct. 2321, 2327-28 (2007). Because the record in this case shows that any potential error did not have a "substantial and injurious effect" on the jury's verdict, we cannot grant Tilmon's petition.

As a starting point, Tilmon argues that harmless error has an extremely limited role in the context of confessions. The Supreme

Court has held, however, that confessions are susceptible to harmless-error review on *direct* appeal, a context in which the State bears a higher burden of proving the harmlessness of an error. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991). In *Fulminante*, the Court did caution that "[a] confession is like no other evidence," *id.* at 296, for "a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision," *id.* In concluding that the State had not shown that the error was harmless beyond a reasonable doubt, the Court focused on the fact that, absent the confession, no prosecution was even likely because "the physical evidence from the scene and other circumstantial evidence would have been insufficient to convict." *Id.* at 297.

Tilmon relies on *Fulminante* to contend that, because his was a "full confession," it must have had a substantial and injurious effect on the jury verdict at both the guilt and sentencing phases. We disagree.

First, although Tilmon's confession was a full confession, this is not a case in which the State failed to present other physical evidence tying Tilmon to the murders of Deputy Hathcock and Trooper Lowry. For instance, Tilmon's driver's license was inside Trooper Lowry's vehicle; when Tilmon was arrested, he had Deputy Hathcock's service weapon; and the SKS rifle was recovered from the wrecked Camry. Moreover, numerous witnesses identified Tilmon as a participant in the shootings. By way of example, the Supreme Court of North Carolina summarized one witness's testimony as follows:

> Janice Hocutt and her niece were traveling south on I-95 as they approached the scene where two police vehicles and a bluish-green car were pulled over. Hocutt saw a black male, who was wearing an "orange-brownish" hooded sweatshirt, facing south between the green car and the police vehicles. An officer was standing in front of him facing north. Hocutt saw the black male moving toward the officer, and then she saw something brown being sprayed by the officer. The officer began backing away from the black male and then fell. She then saw the black male kick and punch the officer on the ground. She never saw the officer get up. Hocutt identi-

fied Tilmon as the black male she saw kicking and punching the officer on the ground.

*Golphin*, 533 S.E.2d at 185.

Other witnesses provided probative evidence supporting Tilmon's conviction as well. For example, Waters testified that Tilmon was the one who pointed the rifle at him, while Kevin confessed that Tilmon shot the SKS rifle. In short, unlike *Fulminante*, this is not a case in which, absent Tilmon's confession, the State would have had insufficient evidence to support a conviction. *See, e.g.*, *Taylor v. Maddox*, 366 F.3d 992, 1017 (9th Cir. 2004) (finding substantial and injurious effect under *Brecht* where confession was the only "solid evidence" against defendant and the remaining evidence was "paper-thin"); *Alvarez v. Gomez*, 185 F.3d 995, 999 (9th Cir. 1999) (admission of confession under *Brecht* not harmless when defendant "was convicted of first degree murder under a felony-murder theory" and "[a]bsent the recorded confessions, there was *no* other evidence before the jury linking him to the predicate felony charged by the state" (emphasis in original)).

Instead, the evidence against Tilmon was overwhelming, which is more than the *Brecht* Court's own conclusion that the evidence in that case was "if not overwhelming, certainly weighty." *Brecht*, 507 U.S. at 639. *See also Cooper*, 103 F.3d at 371 (finding error in admitting confession harmless under *Brecht* where remaining evidence was "overwhelming and one-sided"); *Samuels v. Mann*, 13 F.3d 522, 528 (2d Cir. 1993) (affirming harmless error under *Brecht* where evidence of guilt was "comprehensively shown without reference to the codefendants' statements"). We thus find it "highly unlikely," *Richmond v. Polk*, 375 F.3d 309, 335 (4th Cir. 2004), that the jury would have declined to convict Tilmon of first-degree murder absent his confession. Instead, "in light of the record as a whole," *Brecht*, 507 U.S. at 638, we cannot say that the admission of Tilmon's confession "substantially swayed" the jury. *Kotteakos*, 328 U.S. at 765. A mountain of evidence indicates that Tilmon killed two police officers in the line of duty after participating in an armed robbery earlier in the day.

We also cannot say any potential error in admitting Tilmon's confession had a substantial and injurious effect on the sentencing phase.

The jury's guilt-phase verdict included the finding that Tilmon had knowingly and willfully killed two police officers. During sentencing, Tilmon put forth numerous witnesses in mitigation, and yet the jury found only *one* of a total of forty-one statutory and non-statutory mitigating factors offered on his behalf. In contrast, the jury found *all* four statutory aggravating factors submitted to it for each murder. We cannot see how admission of Tilmon's confession impacted the sentencing verdict in any manner. In fact, Tilmon relied on his confession for its potential mitigating value at sentencing, an argument that the jury rejected in declining to find two non-statutory mitigating factors relating to Tilmon's confession: that "shortly after arrest, Tilmon Golphin admitted to law enforcement officers his responsibility for the homicides" and that "Tilmon Golphin has expressed remorse for the murders to the interviewing officers and his grandparents." (J.A. at 899.) Moreover, during the sentencing phase, the State offered additional evidence of Tilmon's mindset by way of the letters in which Tilmon called police officers "PORK CHOPS" and bragged about being a "COP KILLA." (J.A. at 690.) These letters were far more inflammatory than anything in Tilmon's confession.

In sum, even assuming the Supreme Court of North Carolina unreasonably applied *Miranda* and *Edwards* in affirming the admission of Tilmon's confession, we cannot say that admission of Tilmon's confession had a substantial and injurious effect on the jury verdict at either Tilmon's guilt or sentencing phase. Accordingly, we cannot grant Tilmon's writ on this ground either. *See Brecht*, 507 U.S. at 639.

## V.

In reviewing the events of Tilmon's jury trial, we cannot say that the Supreme Court of North Carolina unreasonably applied *Batson* or that the admission of Tilmon's confession, even assuming it was erroneous, caused a substantial and injurious effect on the jury verdict. Accordingly, the decision of the district court dismissing Tilmon's § 2254 petition must be

*AFFIRMED*.