**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-7510**

DONALD JOHN SCANLON,

            Petitioner – Appellant,

      v.

SID HARKLEROAD,

            Respondent – Appellee.

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  Thomas D. Schroeder,
District Judge.  (1:07-cv-00498-TDS-WWD)

Argued:  December 6, 2011          Decided:  February 23, 2012

Before NIEMEYER, SHEDD, and DAVIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Janet Moore, JANET MOORE, ATTORNEY AT LAW LLC, Wyoming,
Ohio, for Appellant.   Mary Carla Hollis, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.
**ON BRIEF:** Roy Cooper, Attorney General, Raleigh, North Carolina,
for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

A North Carolina jury convicted Donald John Scanlon of murdering Claudine Harris, who had employed him as a handyman. After exhausting his state remedies, Scanlon filed this 28 U.S.C. § 2254 action, raising eight claims of error. The district court ultimately awarded summary judgment to the State of North Carolina and dismissed Scanlon's petition. The district court also granted Scanlon a certificate of appealability (COA) on a single claim: whether his attorneys rendered ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), by failing to review and use Harris' medical records at trial. Cognizant of the Supreme Court's recent reminder that a habeas petitioner's burden for meeting Strickland is sufficiently high that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable," Harrington v. Richter, 131 S.Ct. 770, 786 (2011), we affirm the district court.

I.

The North Carolina Court of Appeals (the "Court of Appeals") summarized the trial evidence as follows:

> [Donald Scanlon] worked for Claudine Wilson Harris as a handyman from October 1995 through January 1996 [in Durham, North Carolina]. [Scanlon] lived at Ms. Harris' residence until she discovered that he had been misusing her credit cards and forging checks on

2

her checking account. After Ms. Harris evicted [Scanlon] from her home and sought to take out warrants against him, [Scanlon] threatened to kill her. Ms. Harris told her sister, Barbara Breeden, that she feared that [Scanlon] had a key to her home and she felt that she should have the locks changed. Ms. Harris never changed the locks to her residence; however, as a result of her fears for her own safety, Ms. Harris' nephew, Carlos Breeden, and his girlfriend came to live with her at the end of January 1996.

At around 9:00 p.m. on 27 February 1996, Carlos Breeden found Ms. Harris' body in her bed with a plastic bag wrapped around her head and tied in a knot. Ms. Harris' sweatshirt was pushed up, revealing her underclothes, and her sweat pants and under pants were partially pulled down. Near her bed was a soup can punched with holes, described as a pipe for smoking controlled substances, and a torn-up letter to [Scanlon] expressing her feelings for him. A toxicology report revealed that she had cocaine metabolites in her blood.

On 10 March 1996, authorities arrested [Scanlon] in Syracuse, New York (on unrelated charges) and found in his possession several of Ms. Harris' credit cards, as well as a blank check from Ms. Harris' business checking account. The arresting officers also seized pieces of paper containing Ms. Harris' address, date of birth, social security number, and her First Union checking account number. Meanwhile, in New Orleans, where [Scanlon] admittedly abandoned Ms. Harris' car a few days before, police officers found three keys in the car, none of which fit the lock to Ms. Harris' home.

State v. Scanlon, 626 S.E.2d 770, 775 (N.C. Ct. App. 2006) (Wynn, J.). Based on the foregoing, a grand jury indicted Scanlon on March 18, 1996, charging him with the first-degree murder of Harris, felonious breaking and entering of her residence, and felonious larceny and possession of her car and her credit cards.

At trial, the State introduced forensic evidence indicating that Scanlon was in Harris' home near the time of her death:

> A cigarette butt in Harris' house, not present two days before her death, contained saliva that matched Scanlon's saliva. Scanlon's head hairs and one pubic hair were found on Harris' bed. Further, on the day of Harris' death Scanlon pawned a gold ring similar to one that Carlos Breeden owned and which went missing following Harris' death.

Scanlon v. Harkleroad, 740 F.Supp.2d 706, 709 (M.D.N.C. 2010).

The State also put forth evidence that Scanlon told his arresting agents that he was abducted from his motel room in Durham the weekend before Harris' murder and, after being held for several days, was released, given Harris' car and credit cards, and told to leave the area.

Scanlon's trial counsel, Brian Aus and Lee Castle, pursued a two-track defense by contending that Harris' death was not a homicide—but rather a suicide or an accidental death due to cocaine-induced coronary blockage during attempted sexual asphyxiation—and that Scanlon was not in Durham at the time of Harris' death. To support the theory of accidental death, Scanlon's expert, Dr. Lawrence Harris, testified that, based on "the plastic bag, cocaine metabolites, 'new clots' blocking the bypass artery in Ms. Harris' heart, her disarranged clothing, and the round bed where her body was discovered," Harris died during attempted sexual asphyxiation. State v. Scanlon, 626 S.E.2d at 776. On cross-examination, however, Dr. Harris

4

admitted that he never reviewed Harris' medical records and conceded that it was likely someone else put the bedcovers over her and tied the knot in the plastic bag.

To counter this defense, the State elicited testimony from Dr. Robert Thompson, a forensic pathologist who supervised Harris' autopsy. Dr. Thompson testified that Harris' cause of death was asphyxiation and that the manner of death was homicide. Consistent with this view, Dr. Thompson testified that Harris had bruising around her eye that could have been caused by a fist and marks on her arms that could have been caused by someone grabbing her.

Also at trial, Scanlon put forth evidence that Harris was hospitalized in December 1995, had severe coronary artery disease, had likely suffered a heart attack in the past, and had undergone coronary bypass surgery. The State, however, represented that Harris' surgery had helped her regain some functionality and corrected her heart problems.

The jury convicted Scanlon of all charges and, following a penalty phase, he was sentenced to death. On May 5, 2000, Scanlon filed a Motion for Appropriate Relief (MAR) arguing, inter alia, that his counsel was ineffective under Strickland for failing to use Harris' medical records at trial to show that her heart condition was extremely serious and to establish that she had a history of clinical depression, making suicide a

5

possible cause of death. The MAR court held an evidentiary hearing, during which Scanlon's trial attorneys both testified. In addition, Scanlon presented testimony from multiple expert witnesses opining on Harris' medical records, including a cardiologist, two forensic pathologists, a clinical psychologist, and a psychiatrist. These experts testified, generally, that Harris was a good candidate for "sudden death" given her heart condition, particularly if she ingested cocaine. Regarding her mental health records, Scanlon's experts testified that Harris had significant risk factors for suicide and that her death was consistent with a successful suicide attempt. However, only one expert would affirmatively testify that suicide was the cause of death, but even that expert allowed that he "[did not] have any problem with undetermined" as the cause of death because "[t]here are features of virtually every single manner of death in this case." (J.A. 2445).

Dr. Thompson also testified at the MAR hearing, and he concluded that although the medical records would have led him to consider suicide or undetermined as the cause of death, ultimately the records did not alter his trial testimony that Harris' cause of death was asphyxiation and that the manner of death was homicide. Dr. Thompson testified that he based this conclusion in part on the scene of the death—including the bedcovers placed over Harris and the plastic bag around her

6

head. In addition, Dr. Daniel Gianturco, Harris' treating psychiatrist, testified that he did not believe Harris was suicidal and that he did not see signs of suicidal ideation.

The MAR court issued its ruling on February 25, 2004, concluding that counsel was not constitutionally ineffective in its representation as to the guilt phase of Scanlon's trial, but that counsel was ineffective regarding the sentencing phase.[1] The State declined to pursue the death penalty at the new sentencing hearing, and Harris was sentenced to life imprisonment without parole. Relevant here, Scanlon appealed the MAR court's denial of relief as to the guilt phase, and the Court of Appeals affirmed. State v. Scanlon, 626 S.E.2d 789-91. The Court of Appeals recognized that Scanlon's claim arose under Strickland, and that Scanlon had the burden of establishing that counsel's performance was deficient and that the deficiency caused him prejudice. The Court of Appeals affirmed the MAR court's ruling denying Scanlon relief, concluding that "even if

---

[1] The MAR court based its determination regarding the sentencing phase on the State's use of the aggravating factor that the murder was "especially heinous, atrocious, or cruel." The MAR court concluded that the medical records could have disputed the State's position that the murder was cruel and heinous because Harris suffered "air hunger" before her death. In the MAR court's view, the medical records could have shown that, given Harris' heart condition, her death would have occurred quickly. (J.A. 4311-4317).

7

trial counsel's actions were objectively unreasonable, [Scanlon] was not prejudiced." Id. at 791.

The Supreme Court of North Carolina denied Scanlon's request for discretionary review and dismissed his appeal, and this § 2254 petition followed. After Scanlon filed his petition, both parties filed cross motions for summary judgment. The petition was referred to a magistrate judge, who recommended granting the State's motion and dismissing Scanlon's petition. The magistrate judge concluded that trial counsel's performance was deficient within the meaning of Strickland but that Scanlon could not establish prejudice. Scanlon timely filed objections and, relevant here, the district court concluded that the Court of Appeals' decision was an unreasonable application of Strickland as to the deficient-performance prong. Scanlon v. Harkleroad, 740 F.Supp.2d at 728-30. The district court also found, however, that the Court of Appeals' ruling on the prejudice prong was not an unreasonable application of Strickland. Id. at 730. In reaching this conclusion, the court noted "significant evidence of Scanlon's guilt that would not have been controverted by the use of the Records at trial," including the physical evidence tending to place Scanlon in Harris' residence around the time of the murder, the evidence of Scanlon's prior threats against Harris, and the evidence that

8

Harris had a "potential altercation" at or near the time of her death.  Id.

The district court therefore granted the State's motion for summary judgment and dismissed Scanlon's petition.  The court granted Scanlon a COA on his Strickland claim.  See 28 U.S.C. § 2253(c)(2).

II

A.

On appeal, Scanlon agrees with the district court that the Court of Appeals unreasonably applied Strickland's deficient-performance prong.  Scanlon argues, however, that the district court erred in concluding that the Court of Appeals reasonably applied Strickland's prejudice prong.  "We review de novo the district court's decision to deny [Scanlon's] § 2254 petition based on the record before the [state court], applying the same standards as did the district court."  Golphin v. Branker, 519 F.3d 168, 178 (4th Cir. 2008).  "Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), the scope of our review in cases on collateral review from a state court proceeding that adjudicated a claim on the merits is both deferential and highly constrained."  Id.  That is, under § 2254, federal habeas relief may not be granted unless a petitioner shows that the earlier state court's decision "was

9

contrary to" clearly established federal law, § 2254(d)(1); Williams v. Taylor, 529 U.S. 362, 412 (2000)[2]; or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Recently, the Supreme Court reiterated the scope of federal habeas review of Strickland claims. Harrington, 131 S.Ct. at 786. The Court began by explaining that a showing of error is insufficient under § 2254, because "[f]or purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Id. at 785 (quoting Williams, 529 U.S. at 410). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 786. As the Court

---

[2] Scanlon also contends that the Court of Appeals' decision is "contrary to" "clearly established federal law" under 2254(d)(1). That prong of § 2254 applies when the state court failed to recognize the clearly established federal law or applied the incorrect clearly established law. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000) (noting "contrary to" clause applied "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."). In this case, however, the Court of Appeals applied the correct federal law (Strickland) and the "contrary to" clause is not implicated.

succinctly stated, "[i]f this standard is difficult to meet, that is because it was meant to be."  Id.

In the Strickland context, a federal habeas court "must determine what arguments or theories supported or, [if none were stated], could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Id. Habeas relief is appropriate only if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  Id. The Court reminded lower courts that, even without § 2254's deference, the Strickland standard "is a most deferential one." Id. at 788.  Moreover, "[w]hen combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether 'there is any reasonable argument that counsel satisfied Strickland's deferential standard.'"  Johnson v. Sec'y, DOC, 643 F.3d 907, 910-11 (11th Cir. 2011) (quoting Harrington, 131 S.Ct. at 788).  "Double deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding."  Id. at 911.

11

B.

In this case, the district court properly performed the role of a federal habeas court. It recognized the deferential Strickland standard and applied that standard correctly and in "tandem" with § 2254(d) to determine that the Court of Appeals' application of Strickland was not unreasonable. Harrington, 131 S.Ct. at 788. In so doing, the district court heeded the Harrington Court's admonition that an "unreasonable application . . . is different from an incorrect application of federal law," id. at 785 (internal quotation marks omitted) (emphasis in original), and "guard[ed] against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d)," id. at 788. Accordingly, having reviewed the voluminous record and the parties' briefs, we affirm substantially on the reasoning of the district court. See Scanlon, 740 F.Supp.2d at 728-30.[3]

---

[3] Because we affirm the district court's conclusion that the Court of Appeals did not unreasonably apply Strickland's prejudice prong, we do not address the State's alternate argument that the Court of Appeals did not unreasonably apply the deficient-performance prong.

12

III.

For the foregoing reasons, the district court's judgment denying and dismissing Scanlon's § 2254 petition is

AFFIRMED.